UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

CHRISTEL BILLHOFER, On Behalf of    :
Herself and All Others Similarly Situated,    :

              Plaintiff,    :

     vs.    :

FLAMEL TECHNOLOGIES, SA, et al.,    :

              Defendants.    :

—————————————————————— x

Civil Action No. 1:07-cv-09920-RWS

<u>CLASS ACTION</u>

MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR CLASS
CERTIFICATION, CERTIFICATION OF
CLASS REPRESENTATIVE AND
APPOINTMENT OF CLASS COUNSEL

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ....................................................................1

II.     STATEMENT OF FACTS ........................................................................2

     A.     Flamel Learns the Results of the CASPER Trial......................................3

     B.     Defendants Conceal the Results of the CASPER Trial ............................3

     C.     The Truth Is Revealed.............................................................................4

III.     ARGUMENT........................................................................................4

     A.     The Class Satisfies the Rule 23 Requirements ........................................4

         1.     Securities Cases Are Particularly Suited for Class Action Treatment ..................................................................................4

         2.     The Standards for Class Certification...........................................5

         3.     The Proposed Class Satisfies Rule 23(a) ....................................7

             a.     The Proposed Class Is so Numerous that Joinder of All Members Is Impracticable...............................................7

             b.     Questions of Law and Fact Common to the Members of the Class Exist.................................................................8

             c.     The Claims of the Proposed Class Representative Are Typical of the Class ....................................................10

             d.     The Proposed Class Representative and Her Counsel Will Fairly and Adequately Prosecute the Case on Behalf of the Proposed Class ............................................................11

         4.     The Proposed Class Representative Satisfies the Rule 23(b)(3) Requirements ...........................................................................13

             a.     Common Questions of Law or Fact Predominate.........................13

                 (1)     The Market for Flamel's ADRs Was Efficient Throughout the Class Period...............................................16

**Page**

    (2)  While Not a Proper Inquiry at Class Certification,
        Lead Plaintiff has Demonstrated that the Decline in
        Flamel's ADR Price Was a Direct Result of
        Defendants' Prior Misstatements, Omissions and
        Fraudulent Conduct Being Revealed to the Market..........22

   b.  A Class Action Is Superior to Other Available Methods for
      the Efficient Adjudication of This Controversy............................23

IV.  CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Prods. v. Windsor,*
 521 U.S. 591 (1997)......................................................................................1, 14

*Baffa v. Donaldson,*
 222 F.3d 52 (2d Cir. 2000)..................................................................................11

*Barrie v. Intervoice-Brite, Inc.,*
 No. 3:01-cv-1071-K, 2009 WL 3424614
 (N.D. Tex. Oct. 26, 2009) ...................................................................................21

*Basic Inc. v. Levinson,*
 485 U.S. 224 (1988)...........................................................................................15

*Billhofer v. Flamel Techs., SA, et al.,*
 No. 1:07-cv-09920 (CSH), 2009 WL 3241399
 (S.D.N.Y. Oct. 5, 2009) ...............................................................................2, 8, 9

*Blackie v. Barrack,*
 524 F.2d 891 (9th Cir. 1975) ..............................................................................14

*Cammer v. Bloom,*
 711 F. Supp. 1264 (D.N.J. 1989) ................................................................. *passim*

*Cent. State Se. and Sw. Areas Health & Welfare Fund v.*
 *Merck-Medco Managed Care, LLC,*
 504 F.3d 229 (2d Cir. 2007)..................................................................................7

*Cheney v. Cyberguard Corp.,*
 213 F.R.D. 484 (S.D. Fla. 2003)..........................................................................21

*Consol. Rail Corp. v. Town of Hyde Park,*
 47 F.3d 473 (2d Cir. 1995)....................................................................................7

*Darquea v. Jarden Corp.,*
 No. 06 Civ. 722 (CLB), 2008 WL 622811
 (S.D.N.Y. Mar. 6, 2008) ............................................................................8, 12, 14

*Dietrich v. Bauer, et al.,*
 192 F.R.D. 119 (S.D.N.Y. 2000) ................................................................. *passim*

*Dura Pharmaceuticals v. Broudo,*
 544 U.S. 336 (2005)......................................................................................22, 23

Page

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ....................................................................................................6

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985) .......................................................................................6

*Ellenburg v. JA Solar Holdings Co. Ltd.*,
   No. 08 Civ. 10475 (JGK), 2009 WL 1033362
   (S.D.N.Y. Apr. 17, 2009) ..........................................................................................13

*Epifano v. Boardroom Bus. Prods., Inc.*,
   130 F.R.D. 295 (S.D.N.Y. 1990) ...............................................................................2

*Escott v. Barchris Constr. Corp.*,
   340 F.2d 731 (2d Cir. 1965) .......................................................................................4

*Farley v. Baird, Patrick & Co.*,
   No. 90 Civ. 2168 (MBM), 1992 WL 321632
   (S.D.N.Y. Oct. 28, 1992) ............................................................................................1

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ..................................................................................................10

*Gerber v. Computer Assocs. Int'l, Inc.*,
   No. 91 CV 3610 (SJ), 1995 WL 228388
   (E.D.N.Y. Apr. 7, 1995) .................................................................................8, 10, 24

*Green v. Wolf Corp.*,
   406 F.2d 291 (2d Cir. 1968) ................................................................................1, 25

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) ......................................................................................................4

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) .........................................................................13, 16

*In re AMF Bowling Sec. Litig.*,
   No. 99 Civ. 3023 (DC), 2002 WL 461513
   (S.D.N.Y. Mar. 26, 2002) .........................................................................................11

*In re Arakis Energy Corp. Sec. Litig.*,
   No. 95-CV-3431 (ARR), 1999 WL 1021819
   (E.D.N.Y. Apr. 27, 1999) ............................................................................................1

**Page**

*In re Baldwin-United Corp. Litig.*,
   122 F.R.D. 424 (S.D.N.Y. 1986) ...........................................................................10

*In re Blech Sec. Litig.*,
   187 F.R.D. 97 (S.D.N.Y. 1999) .................................................................4, 5, 7, 23

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
   529 F. Supp. 2d 644 (S.D. Tex. 2006) ...................................................................21

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
   No. H-01-3624, 2008 WL 4178130
   (S.D. Tex. Sept. 8, 2008) ......................................................................................13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009).................................................................................5, 22

*In re Frontier Ins. Group Sec. Litig.*,
   172 F.R.D. 31 (E.D.N.Y. 1997) ..............................................................................8

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006).......................................................................................6

*In re Initial Pub. Offering Sec. Litig.*,
   260 F.R.D. 81 (S.D.N.Y. 2009) .......................................................................16, 22

*In re Interpublic Sec. Litig.*,
   No. 02 Civ. 6527 (DLC), 2003 WL 22509414
   (S.D.N.Y. Nov. 6, 2003) ..........................................................................................9

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) .............................................................................7

*In re Netbank, Inc. Sec. Litig.*,
   259 F.R.D. 656 (N.D. Ga. 2009)............................................................................21

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ................................................................... *passim*

*In re Orion Sec. Litig.*,
   No. 08 Civ. 1328 (RJS), 2008 WL 2811358
   (S.D.N.Y. July 8, 2008) .........................................................................................13

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   182 F.R.D. 42 (S.D.N.Y. 1998) .............................................................................11

Page

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   191 F.R.D. 369 (S.D.N.Y. 2000) ...................................................................8, 11

*In re Salomon Analyst Metromedia Litig.*,
   544 F.3d 474 (2d Cir. 2008)........................................................................5, 15

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
   571 F. Supp. 2d 1315 (N.D. Ga. 2007) ............................................................21

*In re SCOR Holding (Switz.) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008)....................................................16, 17, 19

*Kelleher v. ADVO, Inc.*,
   No. 3:06CV01422 (AVC), 2009 WL 2413362
   (D. Conn. Mar. 30, 2009).................................................................................13

*Kennedy v. Tallant*,
   710 F.2d 711 (11th Cir. 1983) ...........................................................................5

*Korn v. Franchard Corp.*,
   456 F.2d 1206 (2d Cir. 1972)..............................................................................5

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ...............................................................16, 20

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ................................................................15, 22

*Maywalt v. Parker & Parsley Petroleum Co.*,
   147 F.R.D. 51 (S.D.N.Y. 1993) ......................................................................1, 5

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002)............................................................................14

*Ohman v. Kahn*,
   No. 87 Civ. 7117 (JFK), 1990 WL 97756
   (S.D.N.Y. June 27, 1990)..................................................................................10

*Oscar Private Equity Investments v. Allegiance Telecom*,
   487 F.3d 261 (5th Cir. 2007) ............................................................................22

*Port Auth. Police Benevolent Ass'n v. Port Auth.*,
   698 F.2d 150 (2d Cir. 1983)................................................................................8

Page

*Robinson v. Metro-North Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001)............................................................................10

*Stoneridge Inv. Partners LLC v. Sci. Atlanta*,
   128 S. Ct. 761 (2008)....................................................................................15

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   No. 05 Civ. 1898 (SAS), 2006 WL 2161887
   (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) ....................15, 16, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007)...................................................................................4

*Trief v. Dun & Bradstreet Corp.*,
   144 F.R.D. 193 (S.D.N.Y. 1992) .........................................................................1

*Vanamringe v. Royal Group Techs., Ltd.*,
   237 F.R.D. 55 (S.D.N.Y. 2006) .........................................................................13

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78.................................................................................................................6, 18

Federal Rules of Civil Procedure
   Rule 23(a).................................................................................... *passim*
   Rule 23(b) ................................................................................... *passim*
   Rule 10b-5...................................................................................1, 15

17 C.F.R.
   §239.13.........................................................................................................19
   §239.33.........................................................................................................19

Lead Plaintiff Christel Billhofer ("Plaintiff" or "Proposed Class Representative") respectfully submits this memorandum of law in support of her Motion for Class Certification, Certification of Class representative, and Appointment of Class Counsel pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.[1]

## I.    PRELIMINARY STATEMENT

Class certification in this securities fraud class action is consistent with long-established precedent in the Second Circuit and the United States Supreme Court. *See, e.g., Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997); *Green v. Wolf Corp.*, 406 F.2d 291, 296 (2d Cir. 1968). Indeed, as this Court has noted, "the Second Circuit has traditionally favored the use of class actions for the resolution of securities law claims, in particular those brought under Rule 10b-5." *Dietrich v. Bauer, et al.*, 192 F.R.D. 119, 122 (S.D.N.Y. 2000) (Sweet, J.)[2]; *see also In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (Sweet, J.) ("[c]ourts have long recognized that [c]lass actions are a particularly appropriate and desireable means to resolve claims based on the securities laws.").[3]

---

[1]    Specifically, Plaintiff seeks an Order: (i) certifying this action as a class action on behalf of those who acquired the American Depository Receipts ("ADR") of defendant Flamel Technologies, SA ("Flamel" or the "Company") between March 23, 2007 and August 22, 2007, inclusive (the "Class Period"), and were damaged thereby (the "Class"); (ii) certifying her as Class Representative; and (iii) appointing her counsel, Lead Counsel Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia" or "Lead Counsel"), as Class Counsel. Excluded from the Class are defendants Flamel, Stephen H. Willard and Rafael Jorda (collectively, "Defendants"), as well as, among others, the members of their immediate families and their affiliates or agents.

[2]    Here, as elsewhere, internal citations and quotations omitted unless otherwise specified.

[3]    In the Second Circuit, cases are legion holding that a class action is particularly appropriate to resolve securities law violations. *See, e.g., In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431 (ARR), 1999 WL 1021819, at *4 (E.D.N.Y. Apr. 27, 1999) (observing that "the Second Circuit has expressed a strong preference for use of the class action device in resolving securities law claims"); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (observing that the Second Circuit "has explicitly noted its preference for class certification in securities cases and the importance of such certification" in that context); *Farley v. Baird, Patrick & Co.*, No. 90 Civ. 2168 (MBM), 1992 WL 321632, at *2 (S.D.N.Y. Oct. 28, 1992) ("class action treatment is usually favored in securities fraud cases"); *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 197 (S.D.N.Y. 1992)

Here, Plaintiff, like all other putative Class members, seeks to prove a uniform and common course of wrongful conduct with respect to Defendants' materially false and misleading statements during the Class Period concerning the success of the Company's then lead product – COREG CR. Plaintiff, through the Court-appointed Lead Counsel, has thus far successfully prosecuted this action on behalf of the Proposed Class by, among other things, successfully defeating Flamel's motion to dismiss the Amended Complaint, dated May 12, 2008 (the "Complaint," cited herein as "¶__"). *See Billhofer v. Flamel Techs., SA, et al.*, No. 1:07-cv-09920 (CSH), 2009 WL 3241399 (S.D.N.Y. Oct. 5, 2009) ("*Billhofer v. Flamel*"). Plaintiff is now engaging in merits discovery. Accordingly, because the benefits of this litigation apply equally to the Class as a whole and this open-market securities fraud action satisfies all applicable requirements under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff respectfully requests that this Court certify the Class, with her as Class Representative, and appoint Lead Counsel as Class Counsel.

## II.    STATEMENT OF FACTS

Flamel is a biopharmaceutical company which develops polymer-based delivery technology for medical applications. ¶4. The Company specializes in helping pharmaceutical companies develop extended release drugs. ¶13. In March 2007, Flamel and its marketing partner GlaxoSmithKline ("GSK") introduced COREG CR (controlled release), which is used in the treatment of moderate to severe congestive heart failure, left ventricular dysfunction following myocardial infarction and hypertension. ¶14. At that time, COREG CR was Flamel's lead product. ¶14.

Prior to the introduction of COREG CR, GSK marketed and sold COREG IR (immediate release), which required users to take one pill twice-a-day. ¶15. By contrast, users of COREG CR

---

("The class action procedure is singularly suited for securities fraud actions. . . ."); *Epifano v. Boardroom Bus. Prods., Inc.*, 130 F.R.D. 295, 298 (S.D.N.Y. 1990) (holding similarly).

need only take the pill once-a-day.  ¶15.  The successful introduction of COREG CR was critical to GSK and Flamel as the companies needed to transition users from COREG IR to COREG CR before generic competition entered the market in late 2007.  ¶15.

Flamel and GSK promoted COREG CR as an improved and better version of COREG IR because it was only required to be taken once-per-day.  ¶16.  It is widely known that a primary issue for cardiac medication users is pill taking compliance, as users of this type of medication have a high incidence of failing to take the required dosage of the medication.  ¶16.  Flamel and GSK hoped that drug-taking compliance would increase if a patient only had to take a pill once-per-day as opposed to twice-per-day.  ¶31.

A.    **Flamel Learns the Results of the CASPER Trial**

In order to prove the benefits of COREG CR, Flamel and GSK commenced a clinical trial to measure the differential compliance, quality of life and satisfaction with medication in chronic heart failure patients taking COREG IR versus COREG CR.  ¶18.  The trial was dubbed the "CASPER Trial."  ¶18.  The primary outcome of the CASPER Trial was pill-taking compliance.  ¶18.  An abstract of the CASPER Trial was required to be submitted to the *Journal of Cardiac Failure* by no later than April 9, 2007.  ¶19.  To meet this deadline, GSK and Flamel were required to complete the CASPER Trial, analyze the associated data, and draw conclusions therefrom – all sufficiently in advance of the April submission date.  ¶19.  The abstract of the CASPER Trial, which was submitted to the *Journal of Cardiac Failure*, concluded that switching from COREG IR to COREG CR "was not associated with better drug taking compliance. . . ."  ¶20.  Thus, the primary selling point for COREG CR was not supported by the CASPER Trial.  ¶20.

B.    **Defendants Conceal the Results of the CASPER Trial**

Instead of disclosing this information, Defendants concealed it while simultaneously issuing positive information about COREG CR, including statements that "it has strong ongoing potential in

- 3 -

all indications." ¶26. These statements were materially false and misleading when issued as they failed to disclose that the CASPER Trial was completed and had concluded that switching from COREG IR to COREG CR was not associated with better drug-taking compliance. ¶28. Defendants' positive statements about COREG CR created an obligation to disclose the adverse conclusion of the CASPER Trial, which materially undermined Defendants' claims about the positive attributes of the Company's proprietary technologies. ¶28.

### C.    The Truth Is Revealed

On August 23, 2007, *The Associated Press* published an article entitled "Flamel Technologies Shares Dive on Disappointing Coreg Study Results," which stated, in part, "Shares of Flamel Technologies plunged Thursday after a study of its once-daily heart disease drug failed to show any benefit over the twice-daily version." ¶29. On this news, Flamel's ADR price dropped from $12.68 to $9.56 per share on extremely heavy trading volume. ¶30.

## III.    ARGUMENT

### A.    The Class Satisfies the Rule 23 Requirements

#### 1.    Securities Cases Are Particularly Suited for Class Action Treatment

"Class actions serve an important function in our system of civil justice," *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981), and have been recognized repeatedly as an important means of enforcing the federal securities laws. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504, 2508 n.4 (2007); *see also In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999) (Sweet, J.) ("It is well recognized that private enforcement of [the securities] laws is a necessary supplement to government regulation.").

Rule 23 allows for the effective enforcement of the securities laws for large numbers of individual investors who have suffered injuries, but do not have a sufficient economic interest to incur the expense or inconvenience of an individual lawsuit. *See, e.g., Escott v. Barchris Constr.*

*Corp.*, 340 F.2d 731, 733 (2d Cir. 1965). As a result, securities law claims are routinely found to be appropriate for class treatment. *See, e.g.*, *NYSE Specialists*, 260 F.R.D. at 80 (Sweet, J.); *Dietrich*, 192 F.R.D. at 122. Furthermore, by providing a single forum within which to litigate the same or similar claims, a class action affords an indispensable mechanism for the conservation of judicial resources. *See, e.g., Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983) ("Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts."). In fact, Rule 23 is broadly structured so as to facilitate certification of class actions. "Accordingly, in an alleged securities fraud case, when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." *Blech*, 187 F.R.D. at 102.

### 2.    The Standards for Class Certification

"Class certification is warranted under Rule 23 where the proposed class representative meets the standards of Rule 23(a) – numerosity, commonality, typicality, and adequacy – and the proposed class action meets the requirements of one of the subsections of Rule 23(b)." *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 (2d Cir. 2008). "[T]he standard of proof applicable to evidence proffered to meet the requirements of Rule 23 [is] a preponderance of the evidence." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (Sweet, J. sitting by designation). In determining whether class certification is appropriate in a securities action, the Second Circuit has "directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation." *Maywalt*, 147 F.R.D. at 54; *see also Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir. 1972) (holding that in determining class certification, courts must be "mindful of the admonition of liberality towards demands for class suit status in securities litigation"). Thus, "the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be

- 5 -

committed in favor of allowing a class action." *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985).

In considering a class certification motion, a court will focus only on whether the prerequisites of Rule 23 are met. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). In doing so, a court may resolve factual issues concerning the prerequisites of Rule 23 when those issues overlap with issues relating to the merits. *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (holding that "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement" and "has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits"). As detailed herein, there are no merits-based issues that impact the Court's consideration of class certification here.

As demonstrated below, the Proposed Class Representative satisfies both the prerequisites of Rule 23(a)[4] and the requirement of Rule 23(b)(3), in that common questions of law and fact predominate and that a class action is superior to alternative methods for the fair and efficient adjudication of Defendants' alleged violations of the Securities Exchange Act of 1934 (the "Exchange Act"). Accordingly, class certification is appropriate here and the Court should grant this motion.

---

[4]     Rule 23 provides that an action may be maintained as a class action if each of the four prerequisites of Rule 23(a) is met and, in addition, the action qualifies under one of the subdivisions of Rule 23(b). The four prerequisites of Rule 23(a) are as follows:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

### 3.    The Proposed Class Satisfies Rule 23(a)

#### a.    The Proposed Class Is so Numerous that Joinder of All Members Is Impracticable

For a class action to be appropriate, the proposed class must be so numerous that joinder of all of its individual members would be impracticable.  *See* Fed. R. Civ. P. 23(a)(1); *NYSE Specialists*, 260 F.R.D. at 69-70.  "The numerosity requirement of Rule 23(a)(1) does not mandate that joinder of all parties be impossible – only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate."  *Cent. State Se. and Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007); *see also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 508 (S.D.N.Y. 1996) (Sweet, J.) ("Impracticability means difficulty or inconvenience of joinder; the rule does not require impossibility of joinder.").  As this Court has held, "[n]umerosity is presumed when a class consists of forty members or more."  *NYSE Specialists*, 260 F.R.D. at 70 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).  In demonstrating that numerosity is satisfied, plaintiffs may rely on reasonable inferences drawn from available facts to estimate the size of the proposed class.  *See Blech*, 187 F.R.D. at 103.  As demonstrated in the accompanying Declaration of Michael A. Marek ("Marek Declaration" or "Marek Decl."), the Proposed Class far exceeds 40 members.  Indeed, during the Class Period there were between 71 and 82 institutional investors alone who are members of the Class.  *See* Marek Decl., at ¶51.  This number excludes smaller and individual investors, who will only add to the number of Class members.  *See id*.

During the Class Period, Flamel had at least 23 million ADRs outstanding, owned by hundreds, if not thousands of persons, with such stock actively trading on the NASDAQ National Market, an open and efficient market.  *See, e.g.*, ¶¶4, 8; Marek Decl., at ¶¶24 n.10, 50.  As such, Plaintiff alleges – and Defendants cannot seriously dispute – that there are at least hundreds, if not

- 7 -

thousands, of members of the proposed Class (*see* ¶8), thus more than satisfying the numerosity

requirement.  *See In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000).

Accordingly, Plaintiff has satisfied the numerosity requirement of Rule 23(a)(1).

### b.       Questions of Law and Fact Common to the Members of the Class Exist

Rule 23(a)(2) requires the existence of common questions of law or fact between members of

the Class.  "The commonality requirement has been applied permissively by courts in the context of

securities fraud litigation, and minor variations in the class members' positions will not suffice to

defeat certification."  *Dietrich*, 192 F.R.D. at 124.

Judge Haight, who was previously assigned to this case, already sustained the allegations of

the Complaint regarding the Class Period for which Plaintiff seeks certification and upheld the

sufficiency of the alleged misstatements.  *See Billhofer v. Flamel,* 2009 WL 3241399, at *12

(denying motions to dismiss).  Evidentiary proof of the claims that have been sustained will

necessarily be common to all members of the Class.  Indeed, in determining whether common

questions exist, Rule 23(a)(2) "requires only that there be 'a common nucleus of operative fact,' not

that there be an absolute identity of facts."  *Gerber v. Computer Assocs. Int'l, Inc.*, No. 91 CV 3610

(SJ), 1995 WL 228388, at *2 (E.D.N.Y. Apr. 7, 1995) (quoting *Port Auth. Police Benevolent Ass'n*

*v. Port Auth.*, 698 F.2d 150, 153-54 (2d Cir. 1983)).

Common questions of law and fact are present where, as here, the alleged fraud involves

material misrepresentations and omissions in documents circulated to the investing public, press

releases and statements provided to the investment community and the media, and investor

conference calls.  *See, e.g., In re Frontier Ins. Group Sec. Litig.*, 172 F.R.D. 31, 40 (E.D.N.Y. 1997)

(disseminating statements that omitted or misrepresented material facts deemed common questions);

*see also Darquea v. Jarden Corp.*, No. 06 Civ. 722 (CLB), 2008 WL 622811, at *2 (S.D.N.Y.

Mar. 6, 2008) ("The alleged misrepresentation leading to artificially inflated stock prices relate to all the investors and the existence and materiality of such misstatements or omissions present important common issues."). Among the many questions of fact or law common to members of the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged in the Complaint;

(b)    Whether Defendants' statements issued during the Class Period were materially false and misleading when issued; and

(c)    The extent of damages sustained by Class Members and the appropriate measure of damages. ¶9.

The repeated misrepresentations and omissions alleged here are of the sort that courts routinely hold to satisfy the "common question" requirement. *See, e.g., In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 WL 22509414, at *3 (S.D.N.Y. Nov. 6, 2003) (plaintiffs raised common issues of law and fact, including whether defendants' "public filings and statements contained material misstatements, whether the defendants acted knowingly or with reckless disregard for the truth in misrepresenting material facts in [defendants'] public filings and press releases, and whether the damages to the investors were caused by the defendants' misstatements").

In denying Flamel's motion to dismiss, Judge Haight held that the Complaint adequately alleged the existence of material misrepresentations, as well as Defendants' scienter. *See, e.g., Billhofer v. Flamel,* 2009 WL 3241399, at *8 ("I find that Billhofer has raised sufficient allegations of nondisclosure."); *id.* at *10 ("The Amended Complaint clearly alleges facts that are more than sufficient to support an inference that Flamel knew *something* about the CASPER study results at *some point* during the Class Period."); *id.* ("The facts as alleged by Billhofer give rise to a strong inference that the defendants knew facts or *had access to information* suggesting that their public statements were not accurate."); *id.* at *12 ("In this case, the allegations clearly give rise to a plausible claim of securities fraud. . . . [t]he pleadings have sufficiently alleged scienter through a strong inference of conscious misbehavior or recklessness."). These misrepresentations and scienter,

- 9 -

which form the basis of Plaintiff's claims, are necessarily common to all members of the Proposed

Class.  Thus, the commonality requirement is satisfied.

**c.     The Claims of the Proposed Class Representative Are Typical of the Class**

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the

claims . . . of the class."[5]  Courts have recognized that, "[a]s a general rule, a plaintiff's claim meets

the typicality requirement if it arises from the same events or course of conduct that gives rise to the

claims of other class members and if it is based on evidence and legal theories consistent with the

other members' claims."  *In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986).

The claims here satisfy the typicality requirement because they "arise[] from the same course of

events, and each class member makes similar legal arguments to prove the defendant's liability."

*Dietrich*, 192 F.R.D. at 124; *NYSE Specialists*, 260 F.R.D. at 70 (citing *Robinson v. Metro-North

Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

In order to meet the typicality requirement, "[t]he claims need not be identical but must

derive from the same general, over-all course of fraudulent conduct."  *Gerber*, 1995 WL 228388,

at *3.  Indeed, as a court in this District observed in an analogous case:

> Because this [typicality] inquiry focuses on the nature of the claims asserted, factual
> differences involving the date, type and manner of the purchase, the investor's perception of
> the transaction, or even the information furnished to him at the time will not destroy
> typicality if each class member was the victim of the same material omissions and the same
> consistent course of conduct.

*Baldwin-United*, 122 F.R.D. at 428.

As demonstrated in Lead Plaintiff's Certification, dated November 2, 2007 (previously filed

---

[5]     The Supreme Court has observed that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982); *accord Ohman v. Kahn*, No. 87 Civ. 7117 (JFK), 1990 WL 97756, at *4 (S.D.N.Y. June 27, 1990) ("The typicality requirement of Rule 23(a)(3) is a close cousin of the commonality requirement.").  Accordingly, inasmuch as commonality has been established, typicality has been established as well.

- 10 -

as Exhibit C to the Declaration of Mario Alba Jr. in Support of the Motion of Christel Billhofer for

Appointment as Lead Plaintiff and for Approval of Selection of Lead Counsel ("Alba Decl."), dated

January 8, 2008), Lead Plaintiff purchased Flamel securities during the Class Period.  She then

suffered a loss when, after the fraud was revealed, the price of Flamel ADRs plummeted.  Thus,

Plaintiff's claims are not only similar to those of the other members of the Class, but they are also

virtually identical.  All members of the Class seek to prove that Defendants made materially false

and misleading statements during the Class Period and failed to disclose material adverse facts about

COREG CR.  As such, Plaintiff and the other members of the Class have been injured by the same

course of conduct by Defendants.  Moreover, the damages that they seek arise from the purchase of

Flamel ADRs at prices that were artificially inflated as a result of Defendants' false and misleading

statements and omissions, and the subsequent decline in the price of the Company's stock when

aspects of the fraud were revealed.  Thus, Plaintiff stands in precisely the same position as other

purchasers of the Company's shares during the Class Period.  *See In re Oxford Health Plans, Inc.*

*Sec. Litig.,* 182 F.R.D. 42, 50 (S.D.N.Y. 1998) (finding typicality where the claims of the putative

class representatives "arise from the same conduct from which the other class members' claims and

injuries arise").  Accordingly, typicality is satisfied here.

> **d.    The Proposed Class Representative and Her Counsel Will Fairly and Adequately Prosecute the Case on Behalf of the Proposed Class**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the

interests of the class."  This requirement is met if a plaintiff does not have interests that are

antagonistic to those of the class, and its chosen counsel is qualified, experienced, and generally able

to conduct the litigation.  *See NYSE Specialists*, 260 F.R.D. at 73 (citing *Baffa v. Donaldson*, 222

F.3d 52, 50 (2d Cir. 2000)); *In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023 (DC), 2002 WL

461513, at *6-*7 (S.D.N.Y. Mar. 26, 2002); *Oxford*, 191 F.R.D. at 376; *Dietrich*, 192 F.R.D. at 126.

Plaintiff satisfies both prongs of the adequacy test.  As noted above, Plaintiff has already successfully represented the interests of the Proposed Class and demonstrated her adequacy to prosecute this action, by, among other things, defeating Flamel's motion to dismiss.  In addition, none of Plaintiff's interests are antagonistic to those of the Class.  As discussed above, all members of the Class allege claims arising from the same wrongful conduct that are based on the same legal theories as Plaintiff's claims.  *See Darquea*, 2008 WL 622811, at *3 ("All claims alleged arise from the same wrongful conduct, and thus, Plaintiff's interests, recouping money invested, are similar to those of the proposed class.  As such, named Plaintiffs will fairly and adequately protect the interests of the class.").  Moreover, Plaintiff is clearly committed to the vigorous prosecution of this action.  Therefore, the interests of the other members of the Class will be more than adequately protected by Plaintiff, as they have been since the inception of this action.

As to the second prong regarding adequacy of counsel, Plaintiff has retained the law firm of Coughlin Stoia to represent her and the Proposed Class in this matter.  As this Court has previously found, "Given Coughlin[] [Stoia's] substantial experience in securities class action litigation . . . the element of adequacy has also been satisfied."  *NYSE Specialists*, 260 F.R.D. at 74.  Among other noteworthy securities fraud cases, Coughlin Stoia has served as lead counsel in *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (MH) (S.D. Tex.), in which it has secured the largest recovery ever obtained in a shareholder class action.[6]  Specifically, commenting on counsel's "clearly superlative litigating and negotiating skills" and the firm's "outstanding reputation, experience, and success in securities litigation nationwide," the *Enron* court stated:

> The experience, ability, and reputation of the attorneys of Coughlin Stoia is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country.

---

[6]    Lead Counsel's firm résumé was filed on January 8, 2008, as Exhibit D to the Alba Decl.

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, No. H-01-3624, 2008 WL 4178130, at *46 (S.D. Tex. Sept. 8, 2008). Indeed, courts within this Circuit have repeatedly found Coughlin Stoia to be adequate and well-qualified for the purposes of litigating class action lawsuits.[7] Thus, Coughlin Stoia is qualified to represent the Class and, along with Plaintiff, will vigorously protect the interests of those shareholders. Accordingly, the requirements of Rule 23(a)(4) are satisfied.

### 4.    The Proposed Class Representative Satisfies the Rule 23(b)(3) Requirements

In addition to meeting the requirements of Rule 23(a), the present action also satisfies the requirements of Rule 23(b). Rule 23(b)[8] requires a proposed class representative to establish that common questions of law or fact predominate over any questions affecting only individual members, and that a class action is superior to other available means of adjudication. Here, common questions of law and fact predominate, and a class action is the superior (if not the only) method available to fairly and efficiently litigate this securities fraud lawsuit.

### a.    Common Questions of Law or Fact Predominate

It is well established that in determining whether common questions predominate, a court's inquiry should be directed primarily toward whether the issue of liability is common to members of the class. Indeed, "[c]lass-wide issues predominate if resolution of some of the legal or factual

---

[7]    *Ellenburg v. JA Solar Holdings Co. Ltd.*, No. 08 Civ. 10475 (JGK), 2009 WL 1033362, at *5 (S.D.N.Y. Apr. 17, 2009); *Kelleher v. ADVO, Inc.*, No. 3:06CV01422 (AVC), 2009 WL 2413362, at *4 (D. Conn. Mar. 30, 2009); *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 278 (S.D.N.Y. 2008); *In re Orion Sec. Litig.*, No. 08 Civ. 1328 (RJS), 2008 WL 2811358, at *6 (S.D.N.Y. July 8, 2008); *Vanamringe v. Royal Group Techs., Ltd.*, 237 F.R.D. 55, 58 (S.D.N.Y. 2006).

[8]    Rule 23(b)(3) provides that an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> (3) the Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

This Court has echoed the Supreme Court's acknowledgement that the predominance requirement "is a test readily met in certain cases alleging . . . securities fraud." *NYSE Specialists*, 260 F.R.D. at 75 (citing *Amchem Prods.*, 521 U.S. at 625). In addition, courts have recognized that common issues of law and fact will generally predominate in actions alleging that materially false representations were made to large groups of investors. *See, e.g., Darquea*, 2008 WL 622811, at *5 (holding that "a scheme to release material misrepresentations and omitting important investor information, resulting in artificially inflated prices . . . constitutes a common course of conduct"). Thus, where, as here, a complaint alleges that defendants have made false and misleading representations and omissions, the issues of law and fact that flow from that conduct predominate over any individual issues, rendering class treatment appropriate:

> The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the "common question" requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit.

*Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).

As noted in the discussion of commonality above, the nature of this case and the elements of Plaintiff's claims involve issues primarily relating to Defendants' misrepresentations and omissions – in short, Defendants' liability to the Proposed Class. *See Darquea*, 2008 WL 622811, at *5 (observing that "each class member, if they were to bring individual actions, would be required to prove the existence of the alleged activities of the Defendants in order to prove liability.").

Reliance is also a question common to all Proposed Class members. The claims asserted

under §10(b) and Rule 10b-5 rely on the fraud-on-the-market doctrine, where reliance is presumed, and plaintiffs are not required to prove awareness of any particular misstatement or omission. *See Basic Inc. v. Levinson*, 485 U.S. 224, 227 (1988); *see also Salomon Analyst*, 544 F.3d at 481 (citing *Stoneridge Inv. Partners LLC v. Sci. Atlanta*, 128 S. Ct. 761, 769 (2008)). Courts in this circuit apply the fraud-on-the market doctrine's presumption of reliance where the company's securities traded in an efficient market. *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 182 (S.D.N.Y. 2008). The Second Circuit recently clarified that plaintiffs do not need to demonstrate a material affect on market price in order to invoke the fraud on the market presumption. *See Salomon Analyst*, 544 F.3d at 482-83. Indeed, "plaintiffs do not bear the burden of showing an impact on price. The point of *Basic* is that an effect on market price is *presumed* based on the materiality of information and a well developed market's ability to readily incorporate that information into the price of securities." *Id*. at 483 (emphasis in original); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898 (SAS), 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) ("At the class certification stage, the securities' trading record may create certain rebuttable legal presumptions about market efficiency. If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient."). Here, because the Company's stock traded on the NASDAQ, Plaintiff is entitled to the presumption of market efficiency.[9]

Although the efficiency of the market for Flamel's ADRs during the Class Period cannot be seriously disputed, Plaintiff has nevertheless submitted evidence of this efficiency. *See* Marek Decl., at ¶1. Marek has completed a comprehensive event study, a fundamental financial and economic

---

[9]    If Defendants attempt to rebut the presumption of market efficiency, Plaintiff reserves her right to submit supplemental evidence on this issue.

analysis, and a detailed review of Flamel's news and disclosures, which additionally demonstrate

market efficiency.

**(1)     The Market for Flamel's ADRs Was Efficient
Throughout the Class Period**

In *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), the court analyzed five company

specific factors to determine market efficiency.[10]   The factors considered in *Cammer* are as follows:

- Whether the security traded at a large average weekly volume;

- Whether a significant amount of analysts followed and reported on the security;

- Whether the security had numerous market makers;

- Whether the company was eligible to file SEC Form S-3; and

- Whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and an immediate response in the security's price.

*Id*. at 1286-87.

In addition to the five *Cammer* factors, courts have also looked at three factors enumerated in

*Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) for market efficiency.  *See, e.g.,*

*Teamsters Local 445*, 2006 WL 2161887, at *5.  These three *Krogman* factors are:

- The company's market capitalization;

- The relative size of the bid-ask spread for the security; and

- The company's float – *i.e.*, the degree to which shares of the security are held by the public, rather than by insiders.

As demonstrated below, all of the above factors are satisfied here, with the exception of S-3

filing eligibility because Flamel, as a non-U.S. entity, was ineligible to file a Form S-3.  *See* Marek

Decl., at ¶38.  Instead, Flamel was eligible – and did in fact file – a Form F-3, which is a foreign

---

[10]     As courts in this District have noted, the *Cammer* factors "are frequently used to determine whether a market is efficient."  *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 94 (S.D.N.Y. 2009) (Schiendlin, J.); *see also In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 574 (S.D.N.Y. 2008) ("To determine if a market for a security is efficient, courts often look to the five factors described in *Cammer v. Bloom*. . . .") (Cote, J.); *Alstom*, 253 F.R.D. at 280 (Marrero, J.).

entity's equivalent of a Form S-3. *See, e.g., SCOR*, 537 F. Supp. 2d at 578 n.35 ("as a foreign issuer, the equivalent [of a Form S-3] would have been a Form F-3 . . .").

First, Flamel's ADRs were actively traded, which is an indicia of efficiency. *See* Marek Decl., at ¶¶23-25, 28. The *Cammer* court found that, "[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1293. During the Class Period, Flamel had an average weekly trading volume of at least 9.2% of outstanding shares – more than four times the amount required to "justify a strong presumption" of market efficiency under *Cammer*. *See* Marek Decl., at ¶27. Thus, the market for Flamel's shares should be afforded a "strong presumption" of efficiency for the Class Period. *See id.* at ¶28.

Second, during the Class Period, Flamel was followed by numerous securities analysts employed by major brokerage firms. Specifically, during the Class Period, eight separate firms issued reports about Flamel. *See id.* at ¶29. Further, at least four additional firms (including Merrill Lynch) participated in investor conference calls hosted by Flamel during the Class Period. *See id.* at ¶30. Also, according to the *Factiva* database, more than two dozen articles and press releases were published about Flamel during the Class Period. *See id.* at ¶56. This extensive analyst and media coverage, in addition to information provided by the Company to the market through SEC filings, supports a finding of efficiency. *See id.*, at ¶¶19, 30.

Third, at all pertinent times, Flamel's ADRs traded on the NASDAQ, which makes use of multiple competing market makers. *See id.* at ¶33. A large number of market makers results in a higher degree of liquidity of a stock. *See id.* at ¶31. Flamel had at least 41 companies serving as market makers for its stock during the Class Period. *See id.* at ¶36. This number of market makers

was almost twice the average number of market makers for all NASDAQ securities during the same time period and further supports a finding of market efficiency.[11]  *See id*.

Fourth, the Court in *Cammer* noted that S-3 registration is indicative of market efficiency. *See Cammer*, 711 F. Supp. at 1284-85.  For a company to be eligible for an abbreviated S-3 registration – as opposed to the more onerous S-1 or S-2 registration – it must have filed reports with the SEC for a minimum length of time and meet certain public "float" (*i.e.*, combined value of shares held by the public) minimums.[12]  The SEC has explained that the market tends to operate efficiently for companies which meet the minimum reporting and float requirements, and thus these companies are permitted to file abbreviated registration statements by incorporating old SEC documents into registration statements by reference.  *See id.* at 1284-85 (The abbreviated integrated registration statement concept "proceeds from the observation that information is regularly being furnished to the market through periodic reports under the Exchange Act. . . .  Form S-3 recognizes the applicability of the efficient market theory . . . with respect to those registrants . . . whose corporate information is widely disseminated, because such companies are widely followed. . . .").  *See also Teamsters Local 445*, 2006 WL 2161887, at *7 ("Courts have found that the SEC permits an S-3 Registration Statement only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.").

---

[11]    From March 2007 through August 2007, the average number of market makers for all NASDAQ securities was 21.  *See* Marek Decl., at ¶36.  This average includes market makers who accounted for less than one percent of a securities activity.  *See id.* n.18.  During this same period, 21 market makers each accounted for at least one percent of the NASDAQ activity in Flamel ADRs. *See id*.  Another 20 market makers each accounted for less than one percent of NASDAQ activity in Flamel.  *See id*.

[12]    When *Cammer* was decided, companies could use the S-3 Registration Form only if they had filed SEC reports continuously for 36 months and had at least $150 million in public float.  *See Teamsters Local 445*, 2006 WL 2161887, at *7 n.95.  Since *Cammer*, the SEC has made these minimums less exacting so that now, a company must only have $75 million in public float and have filed reports with the SEC for twelve consecutive months.  *See id*.

During the Class Period, Flamel met the two market efficiency-related requirements of Form S-3 – at least a 12 month reporting history and a minimum $75 million in public float. During that time, Flamel's total market capitalization ranged from $288 million to $717 million. *See* Marek Decl., at ¶42. As discussed below, the vast majority (*i.e.*, more than 99.4%) of Flamel's ADRs were held by the public – as opposed to by insiders. *See id.* at ¶48. Thus, even at its lowest point during the Class Period, Flamel's public float exceeded $286 million – more than three times what was required for Form S-3 registration during the Class Period and more than one-and-a-half times what was required for Form S-3 registration when *Cammer* was decided. Additionally, before the Class Period, Flamel had been filing regular reports with the SEC for years. *See id.* at ¶38 n.22.

Thus Flamel was eligible to file, and in 2003 did in fact file, a Form F-3, the foreign entity's functional equivalent of the Form S-3. *See, e.g.*, *SCOR*, 537 F. Supp. 2d at 578 n.35 ("as a foreign issuer, the equivalent [of a Form S-3] would have been a Form F-3 . . ."); Marek Decl., at ¶38 n.22; *see also* Form S-3, 17 C.F.R. §239.13; Form F-3, 17 C.F.R. §239.33 (both requiring a twelve month reporting history and $75 million in market capitalization). This further supports the inference that the market for Flamel's securities was efficient.

Fifth, as demonstrated in the Marek Declaration, there was a correlative relationship between new, relevant, widely disseminated information regarding Flamel and a response in Flamel's ADR price. *See, e.g.,* Marek Decl., at ¶¶58, 67. In particular, Marek identified days during the Class Period on which information regarding Flamel was released. *See id.* at ¶64. He then tested to determine whether the price of Flamel's ADRs behaved differently on those days than it did on other days, which would be indicative of a cause-and-effect relationship between news and price reaction – the essence of market efficiency. *See id.* Marek found that "the price of the Flamel ADRs tended to move much more on days when there was unexpected news about the company than on dates

- 19 -

when there was no such news." *Id*. at ¶63.

Most significantly, on August 23, 2007, the day on which an abstract of the CASPER Trial was published, the price of Flamel ADRs fell by 24.6% percent, while the NASDAQ Composite Index and the NASDAQ Biotechnology Index merely decreased by 0.43 percent and 0.14 percent, respectively. *See id*. at ¶65. The lack of other news about Flamel on that date "means that there is absolute statistical certainty that the decline was caused by this [CASPER Trial] disclosure." *Id*. Consistent with the *Cammer* opinion, the timely and appropriate price reactions to new material information on August 23, 2007 is evidence of the efficiency of the market for Flamel's ADRs. The results of these event study tests therefore demonstrate that Flamel's ADRs traded in an efficient market. *See id*. at ¶63.

Sixth, Flamel had a relatively large market capitalization during the Class Period. As noted in the Marek Declaration, during the Class Period, Flamel's market capitalization ranged between approximately $288 million and $717 million. *See id*. at ¶42. This market capitalization far exceeded the market capitalization required in order to file a Form S-3 or F-3 Registration Statement. Flamel's market capitalization also put it in line with the majority of publically traded firms on the NASDAQ, New York Stock Exchange and American Stock Exchange during 2007 and further supports a finding of market efficiency. *See id*. at ¶43-4.

Seventh, during the Class Period Flamel's ADR bid-ask spread was narrow. The bid-ask spread for a security "is the difference between the highest price at which an investor is willing to buy a security (the bid) and the lowest price at which a current holder is willing to sell that security (the ask)." *Id*. at ¶45. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478; *see also* Marek Decl., at ¶45. During the Class Period, the average bid-ask spread for Flamel was 0.198%. This

spread is far narrower than the spread which courts have found sufficient to demonstrate market efficiency. *See, e.g., Barrie v. Intervoice-Brite, Inc.*, No. 3:01-cv-1071-K, 2009 WL 3424614, at *12 (N.D. Tex. Oct. 26, 2009) (bid-ask spread of 0.5% "supports the conclusion that the market for [the security] was efficient"); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (average bid-ask spread of 2.44% "weighs in favor of market efficiency. . . ."); *see also In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 672 (N.D. Ga. 2009) (spread of 0.29% "weighs in favor of market efficiency"). As noted in the Marek Declaration, Flamel's low bid-ask spread did not impose any restrictions on the trading of Flamel's ADRs and further establishes the efficiency of their market. *See* Marek Decl., at ¶46.

Last, during the Class Period, Flamel's public "float" – *i.e.*, the percentage of Flamel's shares that were held by the public, rather than by insiders – was a substantial 99.4%. *See* Marek Decl., at ¶¶24 n.10, 48. This float "clearly classifies Flamel ADRs as having been widely held," thus further supporting the finding that the market for Flamel ADRs was efficient during the Class Period. *Id.* at ¶¶49, 55. Indeed, Flamel's float during the Class Period was significantly larger than the percentage required to "strongly support[]" a finding of an efficient market." *See, e.g., In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 753 (S.D. Tex. 2006) (a float of 92% "strongly supports a finding of an efficient market").[13]

In sum, Plaintiff has provided more than sufficient evidence that the market for Flamel's ADRs during the Class Period was impersonal, open, well developed, and efficient, in that the market price of the Company's ADRs during this time period reflected the publicly available

---

[13]    Other cases have found similarly. *See, e.g., In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (float in excess of 96% "weighs heavily in favor of a finding of market efficiency"); *Netbank*, 259 F.R.D. at 673 (float of 92.63% to 93.68% "weighs in favor of market efficiency"); *Cheney*, 213 F.R.D. at 502 (float of 95% "suggests market efficiency").

information concerning Flamel.  Accordingly, reliance is presumed and Plaintiff satisfies the "predominance" requirement.

Thus, all members of the Class are substantially – if not identically – situated with respect to those claims.  In fact, it is difficult (if not impossible) to discern any liability issues that are not common to the claims of each member of the Class and, once common questions of liability are resolved, all that remains is the ministerial act of computing the amount of damages suffered by each Class member.  Thus, the predominance requirement is satisfied.

> **(2)    While Not a Proper Inquiry at Class Certification, Lead Plaintiff has Demonstrated that the Decline in Flamel's ADR Price Was a Direct Result of Defendants' Prior Misstatements, Omissions and Fraudulent Conduct Being Revealed to the Market**

Defendants may assert that under *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), this action cannot be certified because Plaintiff cannot show loss causation on a common basis throughout the Class Period.  These assertions fail.  Indeed, notwithstanding the Fifth Circuit's decision in *Oscar Private Equity Investments v. Allegiance Telecom*, 487 F.3d 261 (5th Cir. 2007), in this Circuit, it is not the plaintiffs' burden to establish loss causation for class certification.  *See Flag Telecom*, 574 F.3d at 39 ("The cases cited from this Circuit represent the position that a plaintiff is entitled to a presumption of reliance at the class certification stage that does not require the court to make a conclusive finding as to loss causation in order to trigger the fraud-on-the-market presumption. . . ."); *see also Initial Pub. Offering*, 260 F.R.D. at 106 ("At the class certification stage, plaintiff need not demonstrate loss causation.").  These decisions are consistent with a long line of caselaw within this Circuit. *See Lapin*, 254 F.R.D. at 185-86 (reviewing cases).

Moreover, even assuming, *arguendo*, that the Court addresses loss causation at this juncture of the proceedings, class certification here is appropriate because common issues of loss causation predominate.

- 22 -

Loss causation relates to the issue of whether an alleged fraud caused plaintiff to suffer economic losses. In *Dura Pharmaceuticals*, the Supreme Court stated that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," because "if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." 544 U.S. at 341-42. In other words, there has to be some causal relationship between the alleged misrepresentations and the economic loss plaintiffs seek to recover. For example, when the relevant truth was publicly disclosed on August 23, 2007, Flamel's ADR price declined in a statistically significant manner, causing Class members to suffer economic damages as a result of the alleged fraud. *See* Marek Decl., at ¶65. Thus, the significant decline in Flamel's ADRs after these disclosures came to light was a direct result of the nature and extent of Defendants' prior misstatements, omissions and fraudulent conduct finally being revealed to investors and the market. *See id.*

> **b.** **A Class Action Is Superior to Other Available Methods for the Efficient Adjudication of This Controversy**

As this Court has repeatedly held, "securities cases 'easily satisfy the superiority requirement of Rule 23.'" *NYSE Specialists*, 260 F.R.D. at 80 (citing *Blech*, 187 F.R.D. at 107). Not only do common questions predominate in the present litigation, but, as further required by Rule 23(b)(3), "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23 (b)(3) sets forth the following factors to be considered in making a "superiority" determination:

> (A) the interest of members of the class individually controlling the prosecution . . . of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class;
>
> (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and

(D)    the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

In this litigation, the interest of members of the Class in individually controlling the prosecution of separate actions is minimal, because the costs and expenses of individual actions, when weighed against the individual recoveries potentially obtainable, would be prohibitive.  Indeed, as this Court observed in finding a class action superior to the "fair and efficient adjudication" of another securities case, "[t]housands of investors may have claims against the Defendants.  To force each [ ] shareholder to litigate separately would be unfair to each of them, as well as to Defendants. It would risk disparate results among those that sought redress and be an inefficient use of judicial resources."  *Gerber*, 1995 WL 228388, at *4.  Thus, the first superiority factor is satisfied.

In addition, the Proposed Class Representative is not aware of any similar individual suits currently pending against Defendants.  As such, there is no dispute that this Court is a desirable forum for concentrating the litigation of Class members' claims.  Accordingly, the second and third superiority factors are satisfied.

Finally, Plaintiff does not envision that any significant difficulties will likely be encountered in managing this case as a class action.  This action is appropriate for class treatment, embodying all of the hallmarks, both in form and in substance, of the types of securities actions that are routinely certified in this Circuit and elsewhere.

Thus, as the Second Circuit has recognized, a class action is superior to other available methods – particularly duplicative individual lawsuits – for the fair and efficient adjudication of a controversy affecting a large number of securities holders injured by violations of the federal securities laws, *i.e.*, precisely this case:

- 24 -

[A] class action [in a federal securities action] may well be the appropriate means for expeditious litigation of the issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf.

*Green*, 406 F.2d at 296.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant her motion for class certification and, in doing so, certify the Class defined herein, designate her as Class Representative, and appoint Lead Counsel as Class Counsel.

DATED:  January 22, 2010                COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                           SAMUEL H. RUDMAN
                                           DAVID A. ROSENFELD
                                           JARRETT S. CHARO

                                            *  /s/ David A. Rosenfeld*
                                           DAVID A. ROSENFELD

                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)

                                            *Lead Counsel for Plaintiff*

- 25 -

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that January 22, 2010, I caused a true and

correct copy of the attached:

Notice of Motion for Class Certification, Certification of Class Representatives and Appointment of Class Counsel;

Memorandum of Law in Support of Motion for Class Certification, Certification of Class Representatives and Appointment of Class Counsel; and

Declaration of Michael A. Marek

to be served electronically on all counsel registered for electronic service for this case.

*/s/ David A. Rosenfeld*
David A. Rosenfeld