UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

CHRISTEL BILHOFER, ON Behalf of    :    Civil Action No. 1:07-cv-09920-RWS
Herself and All Others Similarly Situated,    :
    :    CLASS ACTION
    Plaintiff,    :
    :    DECLARATION OF MICHAEL A. MAREK
    vs.    :
    :
FLAMEL TECHNOLOGIES, SA, et al.,    :
    :
    Defendants.    :

_____x

I, Michael A. Marek, declare as follows:

1.    I have provided the information below in connection with the above captioned action.  If called to testify, I could and would testify to the facts described herein.

## I.    Background and Qualifications

2.    I have been retained in connection with this matter by the law firm of Coughlin Stoia Geller Rudman & Robbins LLP, Counsel for Lead Plaintiff Christel Bilhofer ("Lead Plaintiff").  Lead Plaintiff's Counsel requested that I review and discuss the efficiency of the market for Flamel Technologies, S.A. ("Flamel" or the "Company") American Depositary Receipts ("ADRs") between March 23, 2007 and August 22, 2007, inclusive (the "Class Period").

3.    I am a founding member of Financial Markets Analysis, LLC ("FMA").  FMA is a securities analysis firm with offices in Princeton, New Jersey and San Diego, California.  FMA provides financial analysis and related consulting to its clients.  FMA personnel have frequently been called upon to prepare reports and to testify as securities valuation experts in class actions

under Federal and State securities laws.  Such testimony has included testifying to matters

including: (1) market efficiency; (2) the materiality of information; (3) loss and damage causation;

(4) the valuation of publicly traded securities based upon the hypothetical absence of alleged

misstatements and the disclosure of alleged omissions and misrepresentations; and (5) damage

calculations.

4.      I have achieved the professional designation of Chartered Financial Analyst (CFA)

and am a member in good standing of the CFA Institute (formerly the Association for Investment

Management and Research (AIMR)).  The CFA program is a globally recognized standard for

measuring the competence and integrity of financial analysts.  Its curriculum develops and

reinforces a fundamental knowledge of investment principles. The curriculum includes Ethical and

Professional Standards, Quantitative Methods, Economics, Financial Statement Analysis,

Corporate Finance, Analysis of Debt Investments, Analysis of Equity Investments, Analysis of

Derivatives, Analysis of Alternative Investments, Portfolio Management and Performance

Measurement and Attribution.  A candidate's ability to apply these principles at a professional

level is measured through three levels of examination which must be passed in succession.  I

passed each examination on my first effort.  I participate in the CFA Institute's continuing

education program and I am a member of the New York Society of Securities Analysts

("NYSSA").  A copy of my curriculum vitae is attached as Exhibit A.

5.      My opinions and testimony regarding the subject matters listed above have been

accepted in numerous United States Federal District Court matters, including: (1) *In Re: Ross*

*Cosmetics Securities Litigation*, United States District Court, District of South Carolina,

Spartanburg Division; Master File No. 7-92-1706-3; (2) *In Re Envoy Corporation Securities*

*Litigation*, United States District Court, Middle District of Tennessee, Nashville Division; C.A.

No. 3-98-0760; (3) *In Re: Nice Systems Ltd. Securities Litigation*, United States District Court, District of New Jersey; Civil Action No. 01-737; and (4) *In Re: Pozen Securities Litigation*, United States District Court, Middle District of North Carolina; Master File No. 1:04CV00505.  In addition, I was determined at trial to be qualified as an expert with regard to these issues in *In Re Cysive, Inc. Shareholders Litigation*, Delaware Chancery Court; Consolidated Civil Action No. 20341-NC.   I was retained as the plaintiffs' expert in *In re Executive Telecard, Ltd. Secs. Litig.*, 979 F. Supp. 1021, 1026-26 (S.D.N.Y. 1997), after plaintiffs' original expert was precluded from rendering testimony regarding these issues.  That litigation was settled after my report was produced but before my deposition was taken.  A complete list of matters in which I have testified at deposition and/or trial is attached as Exhibit B.

6.     FMA is being compensated in this matter based on the number of hours expended at the rates charged for personnel, which range from $75 to $450 per hour, plus out-of-pocket expenses.  My current hourly rate is $400.  Neither my nor FMA's compensation is in any way contingent upon the outcome of this matter.


## II.     <u>Summary of Opinions</u>

7.     Based upon my professional knowledge and experience, as well as my review and analyses of the documents and data listed below, it is my opinion that during the Class Period: (1) the market in which Flamel ADRs traded was open, well-developed, active and impersonal; (2) Flamel ADRs were widely owned and traded by numerous market participants; (3) information about Flamel was readily available and disseminated; and (4) the price of Flamel ADRs rapidly reflected new, relevant publicly available information concerning the Company.  Therefore, it is my opinion that the market for Flamel ADRs during the Class Period can be characterized as

efficient. As discussed below, the market for Flamel ADRs during the Class Period met each of the specific factors relied upon by a number of courts to determine whether a particular security traded in an efficient market.

### III.    Bases for Opinions

8.    My opinions are based upon my professional knowledge and experience, as well as my review and analysis of documents and data including the following:

A.    The Amended Complaint for Violation of the Federal Securities Laws, filed March 27, 2008;

B.    Memorandum of Law By Flamel Technologies, SA in Support of Its Motion to Dismiss the Amended Complaint, filed May 12, 2008;

C.    Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, filed on July 17, 2008;

D.    Memorandum of Decision and Order, filed on October 5, 2009;

E.    Filings made by Flamel with the Securities and Exchange Commission ("SEC") before, during and after the Class Period, including Forms 20-F, Forms 6-K, Forms F-3, Proxy Statements and Registration Statements;

F.    Press releases issued by Flamel before, during and after the Class Period;

G.    News articles about Flamel published in the general and financial press before, during and after the Class Period;

H.    Reports about Flamel published by securities analysts;

I.    Daily reported price, volume and quote data for the ADRs of Flamel, other companies' common stocks and stock price indices before, during and after the Class Period; and

J.    Other documents and data cited in this Declaration.

## IV.    Defining An Efficient Market

9.    The concept of an "efficient" market evolved from the Ph.D. dissertation of Eugene Fama.[1] Dr. Fama made the argument that, in an active market that includes many well-informed and intelligent investors, securities prices will reflect all available information.  If the market is efficient, an investment methodology for choosing a portfolio of securities cannot be expected to consistently outperform an appropriate comparative benchmark – for example, a randomly selected portfolio of securities with a similar risk profile.

10.    The Efficient Market Hypothesis (the "EMH") postulates there are three forms of market efficiency - weak, semi-strong and strong.  The three forms of efficient markets are distinguished by the degree of information reflected in securities prices.

11.    The weak form postulates that stock prices reflect information about their past prices, and is widely accepted by market participants.  If markets are weak-form efficient, it is impossible to earn consistent profits by studying past returns alone.  The market is said to "have no memory" regarding past stock prices.  One common methodology for determining whether the market for a security is weak-form efficient is to graphically and statistically analyze price changes on successive days.  As shown below, during the Class Period, there was no significant relationship between Flamel's ADRs price returns on successive days.  That is, the movement in Flamel's ADRs on one day was not predictive of its movement on the next day.

12.    To illustrate this, the graph attached as Exhibit C contains a pattern of paired returns for a hypothetical security which exhibits "autocorrelation," that is, a statistical relationship between the price changes on successive trading dates.  If the price of this hypothetical security rose on Tuesday, it was extremely likely that the price would rise on Wednesday as well.  If the

---

[1] Fama, Eugene F., "Random Walks in Stock Market Prices," *Financial Analysts Journal*, September/October 1965.

price of this security fell on Tuesday, it was extremely likely that the price would fall on Wednesday as well. This predictability is a sign of potential market inefficiency.

13.     During the Class Period, Flamel ADRs were traded on the NASDAQ Stock Market ("NASDAQ"),[2] specifically on the NASDAQ Global Market ("NASDAQ GM") under the ticker symbol FLML. The graph attached as Exhibit D contains "paired returns"[3] for Flamel ADRs during the Class Period. As can be seen in this graph, there is no discernable pattern in the price changes of Flamel ADRs on successive trading days. If the price of Flamel ADRs rose (or fell) on Tuesday, it was as likely to fall (or rise) on Wednesday. In other words, Flamel's stock price followed a "random walk" and thus there was no reliable way to predict the following day's price change based simply on the stock price return today.

14.     Statistically, results of the regression analysis of these two variables (the "Y" or "dependent" variable set equal to the daily percentage changes in the price of Flamel ADRs during the Class Period; and the "X" or "independent" variable set equal to the prior trading day's daily percentage changes) indicate insignificant correlation, as shown in the following statistical summary:

---

[2] During the Class Period, NASDAQ had a three-tier market classification:
• The NASDAQ Global Select Market (established on July 1, 2006);
• The NASDAQ Global Market (formerly known as the NASDAQ National Market); and
• The NASDAQ Capital Market (formerly known as the NASDAQ SmallCap Market).
[3] Each data point in this type of graph is the intersection of a pair of values. The pair consists of: (a) % change on day t (for example, Tuesday); and (b) % change on day t+1 (Wednesday).

x = Change in Flamel ADR on day t
y = Change in Flamel ADR on day t-1

| Regression Statistics | |
|---|---|
| Multiple R | 16.3369% |
| R Square | 2.6689% |
| **Adjusted R Square** | **1.7331%** |
| Standard Error | 3.1747% |
| Observations | 106 |

ANOVA

| | df | SS | MS | F |
|---|---|---|---|---|
| Regression | 1 | 0.00287421 | 0.00287421 | 2.851810835 |
| Residual | 104 | 0.104816872 | 0.001007855 | |
| Total | 105 | 0.107691082 | | |

| | Coefficients | Standard Error | t Stat | P-value |
|---|---|---|---|---|
| Intercept | -0.006272258 | 0.003179089 | -1.97297342 | 0.05115254 |
| X Variable 1 | 0.163435132 | 0.096779876 | 1.688730539 | 0.094267349 |

15.    The "Adjusted R-square" shown in the preceding table is the measure of the "goodness of fit" of the model, and defines how much of the variation in Flamel's ADR price return each day is explained by the variation in the preceding trading date's returns. It assumes a value between 0, indicating no predictive value in the equation, and 1, indicating perfect predictive value. In this case, the R-square was 1.7331%, indicating that only 1.7331% of the variability in Flamel's daily stock price returns was explained by its previous date's return during the Class Period. Inversely, this means that more than 98.2669% of the variability in Flamel's ADR daily returns was not accounted for by its one-day lagged returns. A low R-square, such as this one, means that the regression equation based on the one-day lagged returns would not likely be an accurate predictor of today's returns and could not be practically exploited to generate above-market returns. There is, therefore, a sufficient empirical basis to conclude that the market for Flamel ADRs was weak-form efficient during the Class Period.

16.    At the other end of the spectrum from weak-form efficiency is strong-form efficiency. In a strong-form efficient market, stock prices reflect all information about a stock,

including ***non-public*** information.  According to one leading academic on the subject, strong-form efficiency "…is an extreme form which few people have ever treated as anything other than a logical completion of the set of possible hypotheses."[4]  I will therefore turn my attention to the issue of whether the market for Flamel ADRs was semi-strong form efficient, the applicable standard for purposes of this type of litigation.

17.    The semi-strong form of efficiency postulates that stock prices reflect all ***publicly available*** information.  In markets that are semi-strong efficient, stock prices adjust rapidly to public information.  The speed with which security prices adjust to new information depends upon the nature of the new information and how quickly investors are able to digest the implications of the information.  I agree with Dr. Fama and others that the rapid inclusion of new, relevant information in the price of a security is a reliable indication of market efficiency:

> The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements. The result is so common that this work now devotes little space to market efficiency. The fact that quick adjustment is consistent with efficiency is noted, and then the studies move on to other issues.[5]

18.    The remainder of my discussions and opinions regarding the efficiency of the market for Flamel ADRs during the Class Period refer to efficiency in the semi-strong form.  As discussed in detail below, during the Class Period, the market for Flamel ADRs met the criteria for semi-strong efficiency.

19.    Financial economists and analysts typically examine a number of factors when examining market efficiency, including the number and depth of market participants, the availability of information about the security, and, perhaps most importantly, the responsiveness of

---

[4] Jensen, Michael C. "Some Anomalous Evidence Regarding Market Efficiency." Journal of Financial Economics, Vol. 6, Nos. 2/3 (1978): 95-101.

[5] Fama, Eugene F. "Efficient Capital Markets II." Journal of Finance 46, no. 5 (1991): 1575–1617.

the security price to the disclosure of new information.  These factors are indicative of efficiency because they speak to whether the market for a security is impersonal, open, active, developed and well-informed and to whether information is readily disseminated and fully and accurately incorporated into the price of a security.

20.     A number of courts have relied upon the existence of specific factors to determine whether a particular security traded in an efficient market.  For example, the court in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), a seminal and often-cited case on the issue of market efficiency, discussed five characteristics that were positively related to an inference of market efficiency:

   a.     an active trading market; turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption;

   b.     a significant number of securities analysts following and reporting on the subject security;

   c.     the presence of numerous marketmakers;

   d.     the ability of the company to file a Form S-3 Registration Statement in connection with public offerings; and

   e.     the existence of empirical facts showing a cause and effect relationship between unexpected corporate events and financial releases and an immediate response in the stock price.

21.     Various courts have considered three additional factors that may be indicative of efficiency:[6]

   a.     the Company's market capitalization;

---

[6] In Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc., No. 05 Civ. 1898 (SAS) 2006 U.S. Dist. LEXIS 52991, at *22-24 (S.D.N.Y. Aug. 1, 2006), Judge Scheindlin observed that courts "typically consult some or all" of the five Cammer factors and three additional factors from the economic literature in determining market efficiency.  On appeal, the Second Circuit Court of Appeals also referred to these eight factors as being "routinely applied," while pointing out that it has not adopted a particular test for market efficiency.  Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc., 546 F.3d 196 (2d Cir. 2008).

b.  the relative size of the bid/ask spread for the security; and

c.  the degree to which the shares are widely held by the public rather than insiders.

22.  The remainder of my Declaration will discuss the efficiency of the market for Flamel ADRs during the Class Period in the context of these eight factors. As it is my opinion that the fifth <u>Cammer</u> factor, the existence of a cause and effect relationship between events and security price movements, is most dispositive of market efficiency, I will discuss that factor last.


**V.    Review Of Market Efficiency Factors for Flamel ADRs During the Class Period**

**A.    Flamel ADRs Were Actively Traded During the Class Period**

23.  Empirical studies have found that turnover is a significant contributor to market efficiency.  For example:

> We find two such factors that systematically differentiate between efficiently and inefficiently priced stocks, namely, the volume of trade and the number of analysts following the security.[7]

24.  I examined the trading volume of Flamel ADRs during the Class Period in order to ascertain whether the market could properly be characterized as active.  NASDAQ reported trading volume of Flamel ADRs during the Class Period was 75,981,374 shares,[8] or a weekly average of 3,499,142.[9]  Based on NASDAQ reported volume and 24,041,590 Flamel common

---

[7] Brad M. Berber, Paul A. Griffin, and Baruch Lev, <u>The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency</u>, The Journal of Corporation Law (Winter 1994).

[8] Source for NASDAQ figures: Bloomberg Professional ("Bloomberg") service.  NASDAQ figures are for the period July 23, 2007 through and including August 22, 2007, inclusive.

[9] The Class Period of 106 trading days equates to 21 5/7 seven-day weeks.

shares outstanding at September 30, 2007, the average weekly turnover of Flamel ADRs during the Class Period was 14.9% (3,499,142 / 24,041,590 = 14.9%).[10]

25.    Flamel's NASDAQ turnover figures are more than ample to satisfy <u>Cammer's</u> conclusions: that turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; and that 1% would justify a substantial presumption.

26.    According to one published paper (the "Dyl Study"),[11] NASDAQ trading volume was historically roughly double-counted compared to New York Stock Exchange ("NYSE"), and so an adjustment factor of about 50% would have been required to make the trading volumes reported by the two exchanges comparable.  The Dyl Study demonstrates that the duplicative reporting of share volume had subsided as of 2002 as a greater percentage of NASDAQ shares were being traded on electronic communications networks ("ECNs").  ECNs essentially match buyers and sellers and thereby eliminate market maker intervention. In addition, certain regulations put into place in 2001 which were intended to streamline the NASDAQ reporting mechanism have been effective in reducing duplicative reporting. The Dyl Study, which included data through 2002, supports a reduction of NASDAQ reported volume of approximately 38%.  It is likely that a reduction of less than 38% of NASDAQ reported volume would be necessary to render it comparable to the NYSE during the Class Period in this matter because, for example, ECNs have garnered even a greater market share of trading since 2002.

---

[10] The number of Flamel ADRs outstanding as of December 31, 2006 (23,850,539) represented 99.41% of the Company's common shares outstanding at that date (23,990,590).  During the Class Period, only 51,000 additional common shares of Flamel were issued (on exercise of warrants), bringing the total number of Flamel common shares to 24,041,590 as of the end of the Class Period.

[11] Anderson, Anne-Marie and Dyl, E.A. (2003). <u>Market Structure and Trading Volume</u>. Retrieved May 26, 2006, from http://207.26.165.114/Denver/Papers/MarketStructureandtradingvolume.pdf.

27.     I performed the same calculations of Flamel share turnover discussed above, but reduced the NASDAQ reported trading volume by the 38% figure cited in the Dyl Study, even though the Class Period begins after the period cited in the Dyl Study as possibly requiring a volume adjustment.  Based on 62% of NASDAQ reported volume and the maximum number of Flamel common shares outstanding during the Class Period, the average weekly turnover of Flamel ADRs during the Class Period was 9.2% (2,222,097/24,041,590 = 9.2%).

28.     The NASDAQ adjusted figure is still more than ample to satisfy Cammer's conclusions: that turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; and that 1% would justify a substantial presumption.  It is my opinion that Flamel ADRs were actively traded throughout the Class Period.

**B.**     **A Significant Number of Securities Analysts Followed and Reported On Flamel ADRs During the Class Period**

29.     Neither the Cammer decision nor its progeny specifically quantifies what constitutes a "significant" number of analysts.  I conducted searches of well-known financial data providers including Bloomberg, Thomson, Factiva and Reuters to obtain a compendium of the analyst reports published about Flamel during the Class Period.  My search produced the following list, reflecting investment banking and research firms that continuously issued reports about Flamel during the Class Period:

      Corporate Technology Information Services
      Datamonitor
      Institutional Shareholders Services
      Life Science Analytics
      Merriman Curhan Ford
      Punk, Ziegel & Co.
      Rodman & Renshaw, Inc.
      ValueEngine, Inc.

30.    The Company also hosted regular conference calls for analysts and other investors in conjunction with the release of its quarterly financial results throughout the Class Period. Additional firms which participated in those conference calls included Merrill Lynch, Glenville Investments, Connelly Capital and Iliad Investments. Webcasts of Flamel's teleconferences are archived on the Company's website for some period of time following the event. It is my opinion that the multitude of Company-specific activities and reports issued by the firms listed and discussed above constituted significant coverage of Flamel and its ADRs during the Class Period.

**C.    Flamel ADRs Traded Through Numerous Market Makers During the Class Period**

31.    It is generally accepted and supported by numerous academic studies that the existence of a large number of competitive market makers increases liquidity and enhances the efficiency of trading in listed securities. As summarized in one academic paper:

> A well functioning securities market relies on the availability of accurate information, a broad base of investors who can process this information, legal protection of these investors' rights, and a liquid secondary market unencumbered by excessive transaction costs or constraints.[12]

---

[12] Gene D'Avolio, Efi Gildor, and Andrei Shleifer, Technology, Information Production, and Market Efficiency (unpublished, Harvard University).

32.     During the Class Period, NASDAQ remained the world's largest electronic stock market and the largest U.S. equities exchange.  During 2007, NASDAQ listed more companies (approximately 3,100) and, on average, traded more shares per day than any other U.S. market.[13]

33.     Trading on NASDAQ is facilitated by numerous market makers, as opposed to the mechanism of trading on specialist exchanges such as the NYSE.  According to the Financial Industry Regulatory Authority ("FINRA"),[14] a market maker is:

> A firm that maintains a firm bid and offer price in a given security by standing ready to buy or sell at publicly-quoted prices.  The Nasdaq Stock Market is a decentralized network of competitive Market Makers.  Market Makers process orders for their own customers, and for other broker-dealers; all Nasdaq securities are traded through Market Maker firms.  Market Makers also will buy securities from issuers for resale to customers or other broker-dealers.

34.     Academic research has confirmed that listing on NASDAQ confers a relative liquidity advantage on a security.[15]  In turn, liquidity facilitates and enhances market efficiency.[16]

35.     In order to be listed on the NASDAQ Global Market during the Class Period, Flamel was required to meet the standards attached as Exhibit E.[17]  In addition, NASDAQ-listed companies are required to comply with SEC rules and regulations and regularly file financial and other information with the SEC and to disseminate financial and other information to investors.

---

[13] Source NASDAQ January 3, 2008 press release (NASDAQ Announces Year-End Index Performance Statistics).

[14] According to its website, FINRA is the largest independent regulator for all securities firms doing business in the United States. All told, FINRA oversees nearly 4,750 brokerage firms, about 167,000 branch offices and approximately 633,000 registered securities representatives.  FINRA was created in July 2007 through the consolidation of NASD and the member regulation, enforcement and arbitration functions of the New York Stock Exchange.  http://www.finra.org/AboutFINRA/

[15] See, for example, Gregory C. Sanger and John J. McConnell, Stock Exchange Listings, Firm Value, and Security Market Efficiency: The Impact of NASDAQ; Journal of Financial and Quantitative Analysis, Vol. 21, No. 1 March 1986.

[16] Chordia, Tarun, Roll, Richard W. and Subrahmanyam, Avanidhar, Liquidity and Market Efficiency (March 26, 2007). Available at SSRN: http://ssrn.com/abstract=794264.

[17] Source: http://www.nasdaq.com/about/nasdaq_listing_req_fees.pdf.

36.     Over the course of the Class Period months of March 2007 through August 2007,

21 market makers each accounted for at least 1% of the NASDAQ activity in Flamel ADRs.  This

figure alone placed Flamel in line with the average number of market makers for all NASDAQ

securities over the same time period – 21.[18]  Another 20 market makers each accounted for less

than 1% of NASDAQ activity in Flamel ADRs during this time frame.  A list of the Flamel ADRs

market makers who accounted for at least 1% of Flamel NASDAQ trading activity during the

Class Period is attached as Exhibit F.  A chart which shows the average number of market makers

per NASDAQ security during each month of the Class Period, as compared to the 1% market

makers and all market makers for Flamel ADRs, is attached as Exhibit G.

37.     The significance of numerous competing market makers with respect to the

establishment of an efficient market was summarized in one academic paper as follows:

> Without the benefit of competing market makers, investors will ultimately pay higher prices and will suffer from lower quality executions.
>
> We strongly believe that competition results in superior pricing and improves the efficiency and quality of any market and particularly our securities markets.[19]

---

[18] The NASDAQ average includes market makers which account for less than 1% of activity.

[19] John Rust and George Hall, Middle Men versus Market Makers: A Theory of Competitive Exchange, Revised February 2002.

**D.** **Flamel Was Eligible to File a Form F-3 Registration Statement, the Foreign Private Issuer Equivalent of a Form S-3 Registration Statement**

38.    As a Foreign Private Issuer,[20] Flamel was ineligible to file a Form S-3 Registration Statement with the SEC.  During the Class Period, Flamel was, however, eligible to file a Form F-3 Registration Statement, the Foreign Private Issuer equivalent "short-form" registration statement.[21, 22]  The ability of a company to file a short form registration statement such as Form S-3 or Form F-3, which incorporates information about the company from its previous SEC filings "by reference," is an often-cited indicator that there is sufficient information about the company already in the market.

39.    In 1982, the SEC adopted a comprehensive revision to the rules and forms governing the registration of securities under the Securities Act of 1933:

> Forms S-1, S-2 and S-3 provide the basic framework for the registration of securities under the Securities Act.  These Forms establish three categories for registration statements. The same information will be required to be part of Securities Act registration statements in all categories, either presented in, or delivered with, the prospectus or incorporated by reference from another document. Differences among the three Forms reflect the Commission's determination as to (1) when this required information must be presented in full in the prospectus delivered to investors, (2) when certain of the delivered information may be presented on a streamlined basis and supplemented by documents incorporated by reference, and

---

[20] As defined in Rule 405 of the Securities Act of 1933,

The term foreign private issuer means any foreign issuer other than a foreign government except an issuer meeting the following conditions as of the last business day of its most recently completed second fiscal quarter:

More than 50 percent of the outstanding voting securities of such issuer are directly or indirectly owned of record by residents of the United States; and

Any of the following:

The majority of the executive officers or directors are United States citizens or residents;

More than 50 percent of the assets of the issuer are located in the United States; or

The business of the issuer is administered principally in the United States.

[21] On June 20, 2007, the SEC issued Release No. 33-8812, proposing revisions to the eligibility requirements for primary securities offerings on Forms S-3 and F-3.

[22] In order to register a secondary ADR offering of 3.8 million shares to be sold by the Company and certain of its then-current stockholders, Flamel filed a Form F-3 on August 25, 2003, with Amendments dated September 24, 2003 and October 2, 2003.

(3) when certain information may be incorporated by reference from documents in the Exchange Act continuous reporting system without delivery to investors.[23]

40.    Under the registration framework established in 1982 and in effect during the Class Period:

> The registration statement for the first category is Form S-1. It requires complete disclosure to be set forth in the prospectus and permits no incorporation by reference. Form S-1 is to be used by registrants in the Exchange Act reporting system for less than three years and also may be used by any registrants who choose to do so or for whom no other form is available.
>
> The second category of registration statement is Form S-2, which combines reliance on incorporating Exchange Act reports by reference with delivery to investors of streamlined information. Registrants in the Exchange Act reporting system for three years may use this Form, which allows them to choose to either: (1) Deliver a copy of their annual report to security holders along with the prospectus describing the offering or (2) present registrant-oriented information comparable to that of the annual report in the prospectus along with the description of the offering. In either case, the more complete information in the Form 10-K is incorporated by reference into the prospectus.
>
> Form S-3, *in reliance on the efficient market theory*, allows maximum use of incorporation by reference of Exchange Act reports and requires the least disclosure to be presented in the prospectus and delivered to investors. Generally, the Form S-3 prospectus will present the same transaction-specific information as will be presented in a Form S-1 or S-2 prospectus. Information concerning the registrant will be incorporated by reference from Exchange Act reports. The prospectus will not be required to present any information concerning the registrant unless there has been a material change in the registrant's affairs which has not been reported in an Exchange Act filing or the Exchange Act reports incorporated by reference do not reflect certain restated financial statements or other financial information.[24]
>
> (Emphasis added).

41.    In summary, by virtue of the Company's eligibility to file a Form F-3 Registration Statement when effecting public offerings of its securities, Flamel ADRs traded in an efficient market according to the framework established by the SEC.

---

[23] SEC Release No. 33-6383 (March 3, 1982) [47 FR 11380].

[24] Ibid.

**E.     Flamel's Equity Market Capitalization During the Class Period Ranged From Approximately $288 Million To $717 Million**

42.     Equity market capitalization is defined as the number of common shares of stock a company has issued and outstanding multiplied by the stock price.  Flamel's shares outstanding remained at approximately 24 million during the Class Period.[25]  Based on its April 24, 2007 closing price of $29.87 per ADR, Flamel's equity market capitalization (shares outstanding x price per share) during the Class Period peaked at approximately $717 million.  Based on its August 16, 2007 closing price of $12.02 per ADR, Flamel's market capitalization during the Class Period reached a low of $288 million.

43.     To place these figures in context, during the Class Period, Flamel's market equity capitalization placed it within the ninth and/or tenth deciles of the universe of all companies trading on the NYSE, the American Stock Exchange ("AMEX") and NASDAQ, as compiled and published by the Center for Research in Security Prices ("CRSP") at the University of Chicago. As shown in the table below, Flamel's equity market capitalization placed the Company in the capitalization deciles of 2,416 publicly traded firms.  These deciles constituted 57% of the 4,242 total NYSE/AMEX/NASDAQ companies as of September 2007.[26]

---

[25] As noted above in footnote 10, Flamel's ADRs represented more than 99.4% of its shares outstanding.

[26] Source: 2008 Ibbotson SBBI Classic Yearbook, p. 140.

| Decile | # of Companies | % of Companies | Cumulative # of Companies | % of Cumulative # of Companies | Market Cap of Largest Company in Decile ($ Millions) |
|---|---|---|---|---|---|
| 1 - Largest | 167 | 3.94% | 167 | 3.94% | $ 472,518.672 |
| 2 | 174 | 4.10% | 341 | 8.04% | $ 20,234.526 |
| 3 | 192 | 4.53% | 533 | 12.56% | $ 9,206.713 |
| 4 | 184 | 4.34% | 717 | 16.90% | $ 5,012.577 |
| 5 | 203 | 4.79% | 920 | 21.69% | $ 3,422.743 |
| 6 | 251 | 5.92% | 1,171 | 27.60% | $ 2,411.794 |
| 7 | 275 | 6.48% | 1,446 | 34.09% | $ 1,633.320 |
| 8 | 380 | 8.96% | 1,826 | 43.05% | $ 1,128.765 |
| **9** | **641** | **15.11%** | **2,467** | **58.16%** | **$ 723.258** |
| **10- Smallest** | **1,775** | **41.84%** | **4,242** | **100.00%** | **$ 363.479** |
| **Total** | **4,242** | | | | |

44.    In summary, while Courts have cited market capitalization as an indicator of market efficiency, an objective threshold has not been quantified. However, as shown above, Flamel's Class Period equity market capitalization placed it in line with the majority of publicly traded firms on U.S. trading exchanges. It is my opinion that Flamel's market capitalization was more than sufficient to presume that its stock traded in an efficient market.

**F.    Flamel's Bid-Ask Spread Was Narrow**

45.    The bid-ask spread is the difference between the highest price at which an investor is willing to buy a security (the bid) and the lowest price at which a current holder is willing to sell that security (the ask). The size of the bid-ask spread is indicative of the level of competition in the marketplace for a security – the lower the spread, the more liquid the security is, generally speaking. Bid-ask spreads are one of the components of transactions costs. For example, if an

investor placed a market order to buy a security with a then-current bid-ask spread of $9.75 per share (bid price) to $10.25 per share (ask price), he would pay $10.25 per share, the lowest price at which a seller was currently willing to sell that security. If that investor was forced to immediately sell those shares in an unchanged market, he would receive $9.75 per share pursuant to a market order, the highest price at which a buyer was willing to buy that security. The $0.50 difference between the bid and the ask, 5% of the $10.00 bid-ask price average, is a relatively high cost of trading that stock. A bid-ask spread of 5% potentially diminishes the efficiency of the market for this security. Large bid-ask spreads reflect a cost associated with buying and selling in a less liquid market and may be indicative of an inefficient, relatively illiquid market.

46.    I obtained bid and ask and closing (last) prices for Flamel ADRs during the Class Period from Bloomberg and calculated the bid-ask spread. As shown in Exhibit H, the average quoted closing bid-ask spread for Flamel ADRs during this period of time was $0.04 per share, or 0.20%.[27, 28] In my opinion, the low magnitude of this spread did not impose any restrictions on the trading of Flamel ADRs, which, as discussed above, was highly active.

## G.    Flamel's ADRs Were Widely Held

47.    It is generally acknowledged that a high level of public ownership contributes to market efficiency, as a broader base of non-insider ownership increases competition among buyers and sellers. Those buyers and sellers seek to obtain an advantage over one another through an information discovery process. Large numbers of competing buyers and sellers enhance the speed

---

[27] Bloomberg describes the bid ask spread as "The amount which the ask price is greater than the bid price divided by the last price."

[28] I properly excluded data for May 16, 2007 from the average as it is clearly an outlier and is likely due to reporting and/or measurement error. This one date's reported $1.92 Bid/Ask $ Spread is almost 15 times as high as the next highest figure of $0.13, observed over 105 dates. Likewise, the May 16, 2007 7.02% Bid/Ask % Spread is almost 10 times as high as the next highest figure of 0.75%.

with which information is disseminated among market participants, which generally reduces the bid/ask spread.

48.    Ownership of Flamel shares by its then-current directors and executive officers (i.e. "insiders") was minimal during the Class Period, as shown in the following table:[29]

| Record Date | 4/20/2007 | 3/31/2008 |
|---|---|---|
| Shares Held By Directors, Executive Officers and Senior Managers | 140,900 | 140,500 |
| Total Shares Outstanding | 24,005,590 | 24,066,590 |
| % Held By Directors, Executive Officers and Senior Managers | 0.59% | 0.58% |

49.    This low level of "insider" ownership clearly classifies Flamel ADRs as having been widely held.  As described in one research paper:[30]

> LLS consider two definitions of widely held firms. With their first definition, a firm is widely held if there is no controlling blockholder who owns more than 20% of the votes. Rather than focusing on the largest blockholder, we consider the holdings of the officers and directors of the firm, whom we call insiders as is common practice, so that a firm meets the 20% standard when its insiders own less than 20% of the shares. We find with our dataset that insiders control less than 20% of the cash flow rights in half the firms ten years after their IPO. With this measure, therefore, the road to diffuse ownership is quick for the typical firm. The more restrictive definition of diffuse ownership used by LLS is that there is no controlling blockholder who owns more than 10% of the votes. Strikingly, insiders own less than 10% of the shares in roughly a quarter of the firms five years after their IPO. However, the 10% standard is one that is not met by the typical firm in our sample in any year within thirty years of its IPO.

50.    In terms of the number of holders of its ADRs, the Company disclosed that it had 31 shareholders of record as of April 20, 2007.[31]  Generally, however, a substantial percentage of a

---

[29] Source: Flamel Forms F-20 filed on 04/30/2007 and 05/07/2008.

[30] Jean Helwege, Christo Pirinsky and René M. Stulz, Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership, NBER Working Paper No. 11505, July 2005; JEL No. G30, G32, D0.

publicly-held company's common shares and/or ADRs are held by depositaries, brokerage firms and financial institutions in "street name." Many brokerage firms will automatically put an investor's securities into street name unless the owner gives specific instructions to the contrary. Under street name registration, the brokerage firm will keep records showing the investor as the real or "beneficial" owner, but the investor will not be listed directly on the issuer's books as the registered shareholder.   Instead, the brokerage firm (or some other nominee) will appear as the owner on the issuer's books as the registered shareholder.  In my experience, the number of shareholders of record vastly understates the actual number of beneficial owners.  Companies such as Flamel are likely to have hundreds, if not thousands of actual beneficial owners.

51.    For example, as shown in the table below, as of March 31, 2007 and June 30, 2007, respectively, 82 and 77 large institutional investors alone reported ownership of Flamel ADRs. Large institutional investors, as distinct from small and individual investors, are required to file quarterly reports listing their holdings with the SEC.[32]   Reporting institutional investors', including pension funds', mutual funds', banks' and other professional investors', ownership of Flamel ADRs ranged from 68% to 83% of the Company's shares outstanding during the Class Period, as summarized in the following table and shown in detail in Exhibit I.

---

[31] Source: Forms 20-F filed on 04/30/2007.

[32] Institutional investment managers that use the United States mail (or other means or instrumentality of interstate commerce) in the course of their business and that exercise investment discretion over $100 million or more in Section 13(f) securities (generally exchange-traded (e.g., NYSE, AMEX) or NASDAQ-quoted stocks, equity options and warrants, shares of closed-end investment companies, and certain convertible debt securities) must file a Form 13F. See Section 13(f)(1) of the Securities Exchange Act.

**Flamel Technologies, SA**
Summary of Institutional Holdings

| Quarter End | Shares Outstanding | Institutional Holdings | % Shares Held by Institutional Investors | # of Institutions |
|---|---|---|---|---|
| 12/31/2006 | 23,990,590 | 16,355,091 | 68.17% | 69 |
| 3/31/2007 | 23,990,590 | 19,588,987 | 81.65% | 82 |
| 6/30/2007 | 24,041,590 | 19,927,780 | 82.89% | 77 |
| 9/30/2007 | 24,041,590 | 18,554,810 | 77.18% | 71 |

52.    Institutional investors deploy significant resources, employing analysts, researchers and other specialists to closely monitor and analyze economic and industry conditions as well as individual companies and securities.

53.    One academic paper concluded that institutional ownership results in greater market efficiency by demonstrably facilitating more rapid incorporation of available information into the prices of securities:

> This paper presents evidence that prices of firms followed by sell-side analysts and favored by institutional investors incorporate future earnings earlier than prices of other firms.  Our tests are based on regressions of year t abnormal returns on earnings changes from years t -1, t, and t+1.  We find that lead coefficients for firms most heavily followed by analysts or favored by institutions are greater than lead coefficients for firms with little analyst following or institutional holdings.  In contrast, contemporaneous coefficients for analyst and institutional favorites are less than contemporaneous coefficients for other firms.  Furthermore, the results for analysts and institutions are incremental to each other.  In addition, neither effect is due to the fact that price leads are an increasing function of firm size.[33]

54.    Having hundreds or thousands of unrelated holders unquestionably created an impersonal market for Flamel ADRs during the Class Period.  In *Basic Inc. v. Levinson,* the United

---

[33] Benjamin C. Ayers, Robert N. Freeman, Evidence that Price Leads of Earnings Increase with Analyst Following and Institutional Ownership, July 11, 2001; Social Science Research Network Electronic Library; http://papers.ssrn.com\paper.taf?abstract_id=279556.

States Supreme Court used just such language while asserting a rebuttable presumption to the finding that the market for a particular stock was "impersonal [and] well-developed."[34]

55.    In summary, based upon its level of publicly held float as well as the ownership composition statistics shown above, it is clear that Flamel stock was widely held by numerous informed market participants.  These too are characteristics which are strongly indicative of market efficiency.


**H.    Empirical Facts Show a Cause and Effect Relationship Between Unexpected Corporate Events and a Rapid Response in Flamel's ADRs Price**

56.    During the Class Period, Flamel took affirmative steps to inform the investing public about its business activities.  The Company issued numerous press releases reporting various activities, including its financial results, product introductions and other developments. These press releases were made available to the investing public upon release through newswire services such as Bloomberg News, PR Newswire, Business Wire, Dow Jones News Service, Reuters News, and Associated Press Newswires.  Numerous newspapers, magazines and industry publications, including, but not limited to, *The Wall Street Journal, Barron's,  The New York Times, Life Science Weekly, Biotech Week, Drug Week,* and *The Nanotech Report*  carried these news releases and otherwise reported on developments at the Company.  A search on the Dow Jones Factiva electronic news and information database turned up more than two dozen unique press releases and/or news items relating to Flamel during the Class Period.

57.    In addition to these sources of information, Flamel was required to make regular quarterly and annual filings with the SEC.  These filings provided important information to the

---

[34] See *Basic*, 485 U.S. 224 (1988) at 241, 249 n.28.

market, including its financial statements and other matters affecting the value of its securities. Flamel's SEC filings were available on-line through, among other places, the EDGAR system.[35]

58.    In my opinion, the most telling indication of market efficiency is whether the price of a security responds rapidly to new, relevant information that is widely disseminated.  In 1969, Fama, Fisher, Jensen and Roll pioneered the use of "event studies" in their paper regarding the adjustment of stock prices to announcements of stock splits.[36]  Event studies involve the examination of stock price behavior following announcements of relevant events.  The subject stock price return is typically compared to a "normal" or "expected" return, which might be the defined function of a regression equation, or simply the return of a market index or peer company basket of stocks.  Regarding event studies, and the use of daily stock price data, Fama concluded, "When the announcement of an event can be dated to the day, daily data allow precise measurement of the speed of the stock-price response – the central issue for market efficiency."[37]

59.    Generally, an "event study" involves: (1) identification of the events of interest and definition of the event window; (2) selection of the sample set of firms to include in the analysis; (3) prediction of a normal return during the event window in the absence of the event; (4) estimation of the "residual" or "abnormal" return within the event window, where the abnormal

---

[35] According to the SEC's web site (http://www.sec.gov/edgar/aboutedgar.htm): EDGAR, the Electronic Data Gathering, Analysis, and Retrieval system, performs automated collection, validation, indexing, acceptance, and forwarding of submissions by companies and others who are required by law to file forms with the U.S. Securities and Exchange Commission (SEC). Its primary purpose is to increase the efficiency and fairness of the securities market for the benefit of investors, corporations, and the economy by accelerating the receipt, acceptance, dissemination, and analysis of time-sensitive corporate information filed with the agency.

[36] Fama, Eugene F., Fisher, Lawrence, Jensen, Michael C., and Roll, Richard, "The Adjustment of Stock Prices to New Information," *International Economic Review*, Vol. 10, No. 1, February 1969.

[37] Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance*, Vol. XLVI, No. 5, December 1991.  This paper provided a brief review of several event studies published between 1969 and 1991.  Published literature regarding the event-study methodology is indeed voluminous.  Event study results have been used in hundreds of scholarly articles in leading academic finance journals. For an example of how this type of analysis is applied to securities litigation, see Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson, Virginia Law Review, Volume 77, No. 5, August 1991.

return is defined as the difference between the actual and predicted returns; and (5) testing whether the abnormal return is statistically different from zero.   A "market model" such as the one that I employed in this matter is a generally accepted, widely used method to obtain estimates of abnormal returns.

60.    The approach of this methodology is to use the statistical method of linear regression to extract market-wide and industry effects from overall Company-specific effects of events, for example, the disclosure of information.  I employed standard statistical tests to test for significant Company-specific price changes (commonly referred to as "residuals") on a daily basis. I assessed Flamel's sensitivity to market-wide and industry factors during a "control" period, that is, for a period of time outside the one in dispute.  In this case, I selected the one-year period of March 23, 2006 – March 22, 2007.

61.    As a representative measurement for the market as a whole, I chose the NASDAQ Composite Index (the "NASDAQ Composite").  The NASDAQ Composite is a well-known market-capitalization-weighted index of NASDAQ-listed stocks.  As a representative measurement for Flamel's industry, I chose the NASDAQ Biotechnology Index, designed to measure the performance of all NASDAQ stocks in the biotechnology sector.

62.    Using the regression equation I calculated daily predicted and abnormal (residual) returns for Flamel ADRs during the Class Period.  If the residual return was statistically significant at the 95% two-tailed level, having a t-statistic of 1.96 or greater, then I concluded that a Company-specific event may have occurred on that day, independent of changes in the market and industry indexes.[38]

---

[38] A t-statistic of 1.96 or greater indicates that such a residual return was independent of the benchmark indices with 95% confidence.  This refers to the two "tails" of data under the far left and far right of a bell-shaped, or bell curve.

63.    The results of my event study support my opinion that the market for Flamel ADRs was efficient in absorbing the disclosure of Company-specific information.  Expressed in layman's terms, the price of the Flamel ADRs tended to move much more on days when there was unexpected news about the Company than on dates when there was no such news.  Expressed statistically, of the 107 trading days during the Class Period (including August 23, 2007),[39] I found 17 days on which the price of Flamel ADRs changed by more than one would expect by chance alone.  Of these 17, at least 6 are associated with disclosure of Company-specific information.[40]

64.    Of the 107 trading days during the Class Period, I preliminarily identified a total of 10 days associated with Company-specific disclosures or other Company-specific events (for example, investor presentations, analyst rating changes and notable media coverage).  I have classified these as event dates.  Of the 97 days (107 total days less 10 event days) on which I found no new Company-specific disclosures or events, I found 11 abnormally large price movements (statistically speaking, residual returns statistically significant at the 95%+ level).  One could expect to find approximately 5 such movements.[41]  Conversely, the price of Flamel ADRs common stock changed by a statistically significant amount on 6 of 10 identified Class Period event dates – a figure significantly above the single such occurrence expected under the hypothesis that the market for Flamel ADRs was inefficient.[42]

---

95% of the area under the bell curve occurs within approximately 2 (i.e. 1.96) standard deviations of the average value, with 2.5% remaining on the far left and 2.5% remaining on the far right

[39] Including August 23, 2007, the date on which the Class-ending information was disclosed.

[40] I have used a one-day window to measure significance.  For example, if the Company issued a press release during or before market hours (an event date), the measurement of significance was the difference between the previous trading date's closing price and the event date's closing price.

[41] Mathematically, out of 97 non-event days, one would expect to find 4.9 price movements statistically significant at the 95% level by chance alone; (5 x (97 / 100)).

[42] In an inefficient market, out of 10 event days, one would expect to find 0.5 price movements statistically significant at the 95% level; (5 x (10 / 100)).

65.     Most notably with regard to event dates, on August 23, 2007, the price of Flamel ADRs fell by 24.6% in reaction to the disclosure that study results published in the Journal of Cardiac Failure showed that Coreg CR, a drug which was launched March 22, 2007 and incorporated Flamel's Micropump(R) technology, was only similarly effective as Coreg IR, the twice-daily version of the drug.  By way of comparison, the NASDAQ Composite and the NASDAQ Biotechnology Index fell by small percentages on August 23, 2007, 0.43% and 0.14%, respectively.  With a t-statistic of 11.6, Flamel's August 23, 2007 abnormal price decline (i.e. net of general market and industry influence) was significant at a 100% level of confidence.  The lack of other news on that date means that there is absolute statistical certainty that the decline was caused by this disclosure.

66.     The relatively low volatility of Flamel's ADR prices over non-event dates is also an indicator of the efficiency for the market of Flamel ADRs during the Class Period.  The average absolute residual price return of the ADRs on non-event dates was 2.15%, less than one-third of 6.77%, the corresponding figure for event dates.  This shows statistically that, in the absence of new information regarding the Company and its prospects, Flamel ADRs did not exhibit large price changes, also known as high volatility, beyond what one would expect by statistical probability alone.  The high discrepancy in volatility between non-event dates and event dates is indicative of an efficiently-traded security, that is, one which exhibited a cause and effect relationship between unexpected corporate events and a rapid response in price.

67.     Based on my event study, statistical analysis, and other observations detailed above, it is my opinion that the market for Flamel ADRs was efficient in absorbing the disclosure of Company-specific information.  When important, unexpected news about Flamel was released to the market, the price of its ADRs moved in a directionally appropriate way by a statistically

meaningful amount.  Conversely, Flamel's stock price did not change by a statistically meaningful

amount than would be expected on an overall basis on non-event dates during the Class Period.

## VI.    <u>Summary and Conclusion</u>

68.    It is my opinion that during the Class Period the market for Flamel ADRs was

efficient.  The bases for my opinion include the empirical evidence that:

a.    the price of Flamel ADRs followed a "random walk" and was not predictable by past prices alone;

b.    Flamel ADRs were actively traded during the Class Period;

c.    a significant number of securities analysts followed and reported on Flamel ADRs during the Class Period;

d.    Flamel ADRs were listed and traded on the NASDAQ GM during the Class Period;

e.    information regarding Flamel and its ADRs was widely and readily available to market participants, so much so that Flamel was qualified to issue securities by incorporating that information simply by reference in Form F-3 filings;

f.    Flamel's equity market capitalization during the Class Period placed it amongst most publicly held companies within the NYSE/AMEX/NASDAQ universe; its market capitalization ranged from approximately $288 million to $717 million during the Class Period;

g.    Flamel's ADRs were "widely-held" in absolute terms and under generally accepted definitions of that term;

h.    Flamel's ADRs were held by at least hundreds, and most likely many thousands of unrelated shareholders during the Class Period;

i.    a significant number of institutional investors maintained ownership of Flamel's ADRs during the Class Period;

j.    a sample of bid-ask spreads for Flamel ADRs during the Class Period demonstrates that those spreads were narrow; and

k.    the results of my event study demonstrate that an empirically proven cause and effect relationship existed between material news and events and a rapid response in the price of Flamel's ADRs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 22nd day of January, 2010 at Princeton, New Jersey.

_____
Michael A. Marek

January _____ 2010

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that January 22, 2010, I caused a true and

correct copy of the attached:

Notice of Motion for Class Certification, Certification of Class Representatives
and Appointment of Class Counsel;

Memorandum of Law in Support of Motion for Class Certification, Certification
of Class Representatives and Appointment of Class Counsel; and

Declaration of Michael A. Marek

to be served electronically on all counsel registered for electronic service for this case.


*/s/ David A. Rosenfeld*
David A. Rosenfeld

# Exhibit A

**MICHAEL A. MAREK, CFA**
600 Alexander Road, Suite 2-B
Princeton, NJ 08540
Phone:  (609) 452-9500          Fax:  (609) 452-9881
e-mail: mmarek@fmaonline.biz

## Professional Experience

| | | |
|---|---|---|
| 05/01 - Present | **Financial Markets Analysis, LLC** | Princeton, NJ |
| 12/97 - 04/01 | **Triumph Partners, LLC** | Princeton, NJ |

Founding Member
Provide financial analysis, valuation services and expert litigation support and
testimony.  Areas of concentration include valuation of securities and businesses,
securities law and economic issues.  Testimonial experience in securities class
action litigation.  Clients include corporations, government agencies (SEC),
lawfirms, institutional and individual investors.

| | | |
|---|---|---|
| 10/86 - 12/97 | **Princeton Venture Research, Inc.** | Princeton, NJ |

Vice President
Performed securities valuation and financial analysis in connection with investment
banking, venture capital and securities law expert consulting operations.  Prepared
company and industry research reports, valuations and fairness opinions.
Responsible for project management and supervision of financial analysts and
research personnel.

| | | |
|---|---|---|
| 05/85 - 06/86 | **Sage Data, Inc.** | Princeton, NJ |

Research Analyst
Developed and maintained econometric models and business forecasting systems
for Fortune 500 clients.  Created, produced and instructed customized PC hardware
and software application seminars.

## Education

| | |
|---|---|
| 1984 | **Wharton School of Finance, University of Pennsylvania** |

B.S. Economics
Double Major: Finance / Decision Sciences

## Professional Designations and Affiliations

Chartered Financial Analyst (CFA)
Member, New York Society of Security Analysts (NYSSA)
Member, CFA Institute
Member, American Economic Association (AEA)

# Exhibit B

# Financial Markets Analysis, LLC

600 Alexander Road, Suite 2-B
Princeton, New Jersey 08540
Telephone: (609) 452-9500  ●  Facsimile: (609) 452-9881

## Michael A. Marek, CFA

### List of Trial and Deposition Testimony

**In Re: Ross Cosmetics Securities Litigation**
United States District Court, District of South Carolina, Spartanburg Division;
Master File No. 7-92-1706-3.
Trial Testimony August 14, 1996

**In Re Buffets, Inc. Securities Litigation**
United States District Court, District of Minnesota;
Master File No. 3-94-1447.
Expert Report; Deposition Testimony January 7 and 8, 1999

**In Re Gaylord Container Corporation Securities Litigation**
In the Court of Chancery of the State of Delaware In and For New Castle County;
Consolidated Civil Action No. 14616
Expert Report; Deposition Testimony August 30, 1999

**In Re General Instrument Corp. Securities Litigation - Derivative Actions**
United States District Court, Northern District of Illinois, Eastern Division;
Master File No. 95 C 6007 (GMM)
Expert Report; Deposition Testimony March 8, 2000

**Freedman v. Value Health, Inc., et al.**
United States District Court, District of Connecticut;
Civil Action No. 3:95 CV 2038 (JCH)
Expert Report; Deposition Testimony November 22, 2000

**In Re Ribozyme Pharmaceuticals, Inc. Securities Litigation**
United States District Court, District of Colorado;
Civil Action No. 99-B-2235
Expert Report; Deposition Testimony November 6, 2001

**Marilyn Cain, et. al. v. Healthtrust, Inc., et. al.**
United States District Court, Eastern District of Texas, Marshall Division;
Civil Action No. 2-96-CV-149
Expert Report; Deposition Testimony March 28, 2002; Trial Testimony August 26-27, 2002

**In Re Profit Recovery Group International, Inc. Securities Litigation**
United States District Court, Northern District of Georgia, Atlanta Division;
Master File No. 1:00-CV-1416-CC
Expert Report; Deposition Testimony April 10, 2002

**Steven Gutter, et. al. v. E.I. DuPont De Nemours and Company et. al.**
United States District Court, Southern District of Florida;
Case No. 95-2152-CIV-GOLD
Expert Report; Deposition Testimony September 27, 2002

**Fragrance Express Dot Com, Inc. (fka Growth Industries, Inc.) v. Standard & Poor s Corp.**
United States District Court, Southern District of New York;
Case No. 01-Civ. 0358 (GEL)
Expert Report; Deposition Testimony December 4, 2002

**Stanley Peltz, et. al. v. Polyphase Corporation, et. al.**
United States District Court, District of Nevada;
Case No. CV-S-97-00791-HDM (RJJ)
Expert Report; Deposition Testimony January 15, 2003 and January 29, 2003

**In Re Envoy Corporation Securities Litigation**
United States District Court, Middle District of Tennessee, Nashville Division;
C.A. No. 3-98-0760; Judge Nixon/Griffin
Declaration, Affidavit, Expert Report; Deposition Testimony January 24, 2003

**In Re Cysive, Inc. Shareholders Litigation**
In the Court of Chancery of the State of Delaware In and For New Castle County;
Consolidated Civil Action No. 20341-NC
Expert Report; Deposition Testimony July 17, 2003; Trial Testimony July 24, 2003

**In Re Safety-Kleen Corp. Stockholders Litigation**
United States District Court, District of South Carolina, Columbia Division;
Civil Action No. 3:00-CV-736-17
Expert Report; Deposition Testimony October 2 and 3, 2003

**In re: EIS International, Inc. Securities Litigation**
United States District Court, District of Connecticut
Master File No. 3-97CV00813 (CFD)
Expert Report, Rebuttal Report, Supplemental Report;
Deposition Testimony September 14, 2005

**Daniel Abitbol vs. TradingScreen, Inc. et al.**
American Arbitration Association
Case No. 50 168 T 00219 05
Expert Report;
Testimony April 20, 2006

**In Re: Seitel, Inc. Securities Litigation**
United States District Court, Southern District of Texas, Houston Division
Consolidated Civil Action No. H-02-1566
Declaration, Reply Declaration
Deposition Testimony March 27, 2007

**In Re IMAX Corporation Securities Litigation**
United States District Court, Southern District of New York
Case No. 06-Civ. 6128 (NRB)
Declaration
Deposition Testimony January 23, 2009

**In Re Juniper Networks, Inc, Securities Litigation**
United States District Court, Northern District of California, San Jose Division
Case No. C06-04327-JW (PVT)
Declaration, Rebuttal Declaration
Deposition Testimony April 23, 2009

# Exhibit C

# Example of a Hypothetical Security With
# Successive Returns That Exhibit a Strong Relationship (Autocorrelation)



# Exhibit D

**Flamel Technologies, SA**
**NASDAQ Paired ADR Price Daily Percent Changes**
**March 23, 2007 - August 22, 2007**



# Exhibit E

# NASDAQ GLOBAL MARKET

## INITIAL LISTING

Companies must meet all of the criteria under at least one of the four standards below.

### NASDAQ Global Market Initial Listing Requirements[1]

| Requirements | Income Standard Listing Rules 5405(a) and 5405(b)(1) | Equity Standard Listing Rules 5405(a) and 5405(b)(2) | Market Value Standard Listing Rules 5405(a) and 5405(b)(3)[2] | Total Assets/Total Revenue Standard Listing Rules 5405(a) and 5405(b)(4) |
|---|---|---|---|---|
| Income from continuing operations before income taxes (in latest fiscal year **or** in two of last three fiscal years) | $1 million | N/A | N/A | N/A |
| Stockholders' equity | $15 million | $30 million | N/A | N/A |
| Market value of listed securities[3] | N/A | N/A | $75 million | N/A |
| Total assets and Total revenue (in latest fiscal year **or** in two of last three fiscal years) | N/A | N/A | N/A | $75 million and $75 million |
| Publicly held shares[4] | 1.1 million | 1.1 million | 1.1 million | 1.1 million |
| Market value of publicly held shares | $8 million | $18 million | $20 million | $20 million |
| Bid price | $4 | $4 | $4[2] | $4 |
| Shareholders (round lot holders)[5] | 400 | 400 | 400 | 400 |
| Market makers[6] | 3 | 3 | 4 | 4 |
| Operating history | N/A | 2 years | N/A | N/A |
| Corporate governance[7] | Yes | Yes | Yes | Yes |

[1] Companies must meet the bid price, publicly held shares, and round lot holders requirements as set forth in Rule 5405(a) and at least one of the Standards in Rule 5405(b).

[2] Seasoned companies (those companies already listed or quoted on another marketplace) qualifying only under the Market Value Standard must meet the market value of listed securities and the bid price requirements for 90 consecutive trading days prior to applying for listing.

[3] The term, "listed securities", is defined as "securities listed on NASDAQ or another national securities exchange."

[4] Publicly held shares is defined as total shares outstanding, less any shares held directly or indirectly by officers, directors or any person who is the beneficial owner of more than 10% of the total shares outstanding of the company.

[5] Round lot holders are shareholders of 100 shares or more. The number of beneficial holders is considered in addition to holders of record.

[6] An electronic communications network (ECN) is not considered a market maker for the purpose of these rules.

[7] In addition to the above quantitative requirements, companies must comply with all corporate governance requirements as set forth in the Rule 5600 Series.

# CONTINUED LISTING

Companies must meet all of the criteria under at least one of the three standards below.

### NASDAQ Global Market Continued Listing Requirements[1]

| Requirements | Equity Standard Listing Rules 5450(a) and 5450(b)(1) | Market Value Standard Listing Rules 5450(a) and 5450(b)(2) | Total Assets/Total Revenue Standard Listing Rules 5450(a) and 5450(b)(3) |
|---|---|---|---|
| Stockholders' equity | $10 million | N/A | N/A |
| Market value of listed securities[2] | N/A | $50 million | N/A |
| Total assets and Total revenue (in latest fiscal year **or** in two of last three fiscal years) | N/A | N/A | $50 million and $50 million |
| Publicly held shares[3] | 750,000 | 1.1 million | 1.1 million |
| Market value of publicly held shares | $5 million | $15 million | $15 million |
| Bid price | $1 | $1 | $1 |
| Total shareholders[4] | 400 | 400 | 400 |
| Market makers[5] | 2 | 4 | 4 |
| Corporate governance[6] | Yes | Yes | Yes |

[1] Companies must meet the bid price and total shareholders requirements as set forth in Rule 5450(a) and at least one of the Standards in Rule 5450(b).

[2] The term, "listed securities", is defined as "securities listed on NASDAQ or another national securities exchange."

[3] Publicly held shares is defined as total shares outstanding, less any shares held directly or indirectly by officers, directors or any person who is the beneficial owner of more than 10% of the total shares outstanding of the company.

[4] Total shareholders include both holders of beneficial interest and holders of record.

[5] An electronic communications network (ECN) is not considered a market maker for the purpose of these rules.

[6] In addition to the above quantitative requirements, companies must comply with all corporate governance requirements as set forth in the Rule 5600 Series.

# ENTRY FEES

- Entry fees are based upon the aggregate number of shares to be listed at the time of initial listing, regardless of class.

- Fees are assessed on the date of entry in The NASDAQ Global Market, except for $5,000, which represents a non-refundable application fee. This fee must be submitted with the company's application.

- For non-U.S. issuers, entry fees are levied only on those shares or American Depositary Receipts issued and outstanding in the United States.

- Entry fees paid by a company for all classes of securities listed on the Global Market, including entry fees previously paid by the company to list securities at an earlier date, shall not exceed $150,000. However, notwithstanding this fee cap, applications are subject to the $5,000 non-refundable fee.

# Exhibit F

**Flamel Technologies, SA**
**List of Marketmakers Accounting for 1% or More of ADR Trading Activity**
**March 2007 - August 2007**

| ID | Name | Volume | % |
|----|------|--------|---|
| UBSS | UBS SECURITIES LLC. | 15,947,000 | 20.11% |
| NITE | KNIGHT EQUITY MARKETS, L.P. | 9,887,000 | 12.47% |
| GSCO | GOLDMAN SACHS | 6,065,000 | 7.65% |
| LEHM | BARCLAYS CAPITAL INC. | 5,966,000 | 7.52% |
| CDRG | CITADEL DERIVATIVES GROUP LLC | 5,081,000 | 6.41% |
| BOFA | BANC OF AMERICA SECURITIES LLC | 4,613,000 | 5.82% |
| FBCO | CREDIT SUISSE FIRST BOSTON LLC | 4,519,000 | 5.70% |
| MLCO | MERRILL LYNCH | 3,638,000 | 4.59% |
| AUTO | AUTOMATED TRADING DESK FINANCI | 2,519,000 | 3.18% |
| MSCO | MORGAN STANLEY & CO., INCORPOR | 2,373,000 | 2.99% |
| JPMS | J.P. MORGAN SECURITIES INC. | 2,157,000 | 2.72% |
| BEST | BEAR, STEARNS & CO. INC. | 2,149,000 | 2.71% |
| MERI | MERRIMAN CURHAN FORD & CO. | 1,864,000 | 2.35% |
| COWN | COWEN & CO., LLC | 1,379,000 | 1.74% |
| PERT | PERSHING TRADING COMPANY L.P. | 1,211,000 | 1.53% |
| JEFF | JEFFERIES & COMPANY, INC. | 1,176,000 | 1.48% |
| DBAB | DEUTSCHE BANK SECURITIES INC. | 1,110,000 | 1.40% |
| PUNK | PUNK, ZIEGEL & COMPANY, L.P. | 1,092,000 | 1.38% |
| OPCO | OPPENHEIMER & CO. INC. | 1,044,000 | 1.32% |
| LIMB | LIME BROKERAGE LLC | 945,920 | 1.19% |
| LEER | LEERINK SWANN & CO., INC. | 858,797 | 1.08% |

Source: Bloomberg

# Exhibit G

Flamel Technologies, SA
Quarter-end Month Average Market Maker Activity
Average NASDAQ Security vs. Flamel ADRs
March 2007 - August 2007

| Month | NASDAQ Average (1) | Flamel > 1% | Flamel Total |
|---|---|---|---|
| March-07 | 20 | 17 | 32 |
| April-07 | 20 | 19 | 31 |
| May-07 | 21 | 19 | 33 |
| June-07 | 20 | 23 | 36 |
| July-07 | 21 | 20 | 38 |
| August-07 | 22 | 17 | 39 |
| **Average 03/07 - 08/07:** | **21** | **19** | **35** |

(1) NASDAQ Average includes market makers which account for less than 1% of activity

Sources:  Bloomberg, NASDAQOMXtrader.com Monthly Market Summaries

# Exhibit H

**Flamel Technologies, SA**
Analysis of ADR Closing Bid/Ask Spread

| Date | Closing Bid | Closing Ask | Last Price | Bid/Ask Spread $ (1) | % (2) |
|---|---|---|---|---|---|
| 3/23/2007 | $ 29.07 | $ 29.13 | $ 29.00 | $ 0.06 | 0.21% |
| 3/26/2007 | $ 27.69 | $ 27.70 | $ 27.70 | $ 0.01 | 0.04% |
| 3/27/2007 | $ 26.06 | $ 26.08 | $ 26.07 | $ 0.02 | 0.08% |
| 3/28/2007 | $ 25.83 | $ 25.84 | $ 25.83 | $ 0.01 | 0.04% |
| 3/29/2007 | $ 26.44 | $ 26.47 | $ 26.38 | $ 0.03 | 0.11% |
| 3/30/2007 | $ 25.51 | $ 25.61 | $ 25.60 | $ 0.10 | 0.39% |
| 4/2/2007 | $ 26.29 | $ 26.30 | $ 26.30 | $ 0.01 | 0.04% |
| 4/3/2007 | $ 26.39 | $ 26.48 | $ 26.44 | $ 0.09 | 0.34% |
| 4/4/2007 | $ 27.20 | $ 27.21 | $ 27.21 | $ 0.01 | 0.04% |
| 4/5/2007 | $ 27.91 | $ 27.95 | $ 27.91 | $ 0.04 | 0.14% |
| 4/9/2007 | $ 27.91 | $ 27.96 | $ 27.95 | $ 0.05 | 0.18% |
| 4/10/2007 | $ 28.34 | $ 28.41 | $ 28.34 | $ 0.07 | 0.25% |
| 4/11/2007 | $ 27.40 | $ 27.41 | $ 27.41 | $ 0.01 | 0.04% |
| 4/12/2007 | $ 27.52 | $ 27.53 | $ 27.52 | $ 0.01 | 0.04% |
| 4/13/2007 | $ 28.23 | $ 28.24 | $ 28.24 | $ 0.01 | 0.04% |
| 4/16/2007 | $ 28.93 | $ 28.97 | $ 28.94 | $ 0.04 | 0.14% |
| 4/17/2007 | $ 28.40 | $ 28.50 | $ 28.41 | $ 0.10 | 0.35% |
| 4/18/2007 | $ 27.95 | $ 27.96 | $ 28.02 | $ 0.01 | 0.04% |
| 4/19/2007 | $ 27.77 | $ 27.84 | $ 27.73 | $ 0.07 | 0.25% |
| 4/20/2007 | $ 27.45 | $ 27.48 | $ 27.45 | $ 0.03 | 0.11% |
| 4/23/2007 | $ 28.45 | $ 28.48 | $ 28.48 | $ 0.03 | 0.11% |
| 4/24/2007 | $ 29.85 | $ 29.90 | $ 29.87 | $ 0.05 | 0.17% |
| 4/25/2007 | $ 28.50 | $ 28.52 | $ 28.52 | $ 0.02 | 0.07% |
| 4/26/2007 | $ 28.94 | $ 29.04 | $ 29.01 | $ 0.10 | 0.34% |
| 4/27/2007 | $ 28.93 | $ 28.97 | $ 28.94 | $ 0.04 | 0.14% |
| 4/30/2007 | $ 28.86 | $ 28.91 | $ 28.91 | $ 0.05 | 0.17% |
| 5/1/2007 | $ 28.72 | $ 28.79 | $ 28.71 | $ 0.07 | 0.24% |
| 5/2/2007 | $ 28.95 | $ 28.97 | $ 28.97 | $ 0.02 | 0.07% |
| 5/3/2007 | $ 28.85 | $ 28.97 | $ 28.84 | $ 0.12 | 0.42% |
| 5/4/2007 | $ 27.40 | $ 27.42 | $ 27.40 | $ 0.02 | 0.07% |
| 5/7/2007 | $ 28.81 | $ 28.94 | $ 28.81 | $ 0.13 | 0.45% |
| 5/8/2007 | $ 28.85 | $ 28.91 | $ 28.90 | $ 0.06 | 0.21% |
| 5/9/2007 | $ 29.62 | $ 29.68 | $ 29.67 | $ 0.06 | 0.20% |
| 5/10/2007 | $ 28.09 | $ 28.18 | $ 28.21 | $ 0.09 | 0.32% |
| 5/11/2007 | $ 28.68 | $ 28.72 | $ 28.72 | $ 0.04 | 0.14% |
| 5/14/2007 | $ 27.78 | $ 27.83 | $ 27.83 | $ 0.05 | 0.18% |
| 5/15/2007 | $ 27.14 | $ 27.14 | $ 27.24 | $ - | 0.00% |
| **5/16/2007** | **$ 26.38** | **$ 28.30** | **$ 27.35** | **$ 1.92** | **7.02%** |
| 5/17/2007 | $ 27.30 | $ 27.37 | $ 27.36 | $ 0.07 | 0.26% |
| 5/18/2007 | $ 27.53 | $ 27.57 | $ 27.57 | $ 0.04 | 0.15% |
| 5/21/2007 | $ 27.70 | $ 27.71 | $ 27.71 | $ 0.01 | 0.04% |
| 5/22/2007 | $ 28.41 | $ 28.48 | $ 28.48 | $ 0.07 | 0.25% |
| 5/23/2007 | $ 28.49 | $ 28.51 | $ 28.51 | $ 0.02 | 0.07% |
| 5/24/2007 | $ 27.81 | $ 27.94 | $ 27.89 | $ 0.13 | 0.47% |
| 5/25/2007 | $ 27.94 | $ 27.98 | $ 27.98 | $ 0.04 | 0.14% |
| 5/29/2007 | $ 28.36 | $ 28.44 | $ 28.44 | $ 0.08 | 0.28% |
| 5/30/2007 | $ 27.84 | $ 27.94 | $ 27.83 | $ 0.10 | 0.36% |
| 5/31/2007 | $ 27.75 | $ 27.78 | $ 27.78 | $ 0.03 | 0.11% |
| 6/1/2007 | $ 27.57 | $ 27.59 | $ 27.58 | $ 0.02 | 0.07% |
| 6/4/2007 | $ 27.10 | $ 27.11 | $ 27.11 | $ 0.01 | 0.04% |

**Flamel Technologies, SA**
Analysis of ADR Closing Bid/Ask Spread

| Date | Closing Bid | Closing Ask | Last Price | Bid/Ask Spread $ (1) | % (2) |
|---|---|---|---|---|---|
| 6/5/2007 | $ 25.60 | $ 25.67 | $ 25.60 | $ 0.07 | 0.27% |
| 6/6/2007 | $ 25.25 | $ 25.28 | $ 25.25 | $ 0.03 | 0.12% |
| 6/7/2007 | $ 25.30 | $ 25.34 | $ 25.30 | $ 0.04 | 0.16% |
| 6/8/2007 | $ 24.25 | $ 24.26 | $ 24.25 | $ 0.01 | 0.04% |
| 6/11/2007 | $ 25.01 | $ 25.03 | $ 25.00 | $ 0.02 | 0.08% |
| 6/12/2007 | $ 24.60 | $ 24.61 | $ 24.63 | $ 0.01 | 0.04% |
| 6/13/2007 | $ 25.53 | $ 25.54 | $ 25.55 | $ 0.01 | 0.04% |
| 6/14/2007 | $ 25.56 | $ 25.59 | $ 25.59 | $ 0.03 | 0.12% |
| 6/15/2007 | $ 26.47 | $ 26.51 | $ 26.50 | $ 0.04 | 0.15% |
| 6/18/2007 | $ 24.80 | $ 24.85 | $ 24.80 | $ 0.05 | 0.20% |
| 6/19/2007 | $ 23.46 | $ 23.47 | $ 23.46 | $ 0.01 | 0.04% |
| 6/20/2007 | $ 22.05 | $ 22.07 | $ 22.07 | $ 0.02 | 0.09% |
| 6/21/2007 | $ 21.58 | $ 21.59 | $ 21.60 | $ 0.01 | 0.05% |
| 6/22/2007 | $ 21.20 | $ 21.22 | $ 21.17 | $ 0.02 | 0.09% |
| 6/25/2007 | $ 21.03 | $ 21.07 | $ 21.05 | $ 0.04 | 0.19% |
| 6/26/2007 | $ 21.47 | $ 21.51 | $ 21.53 | $ 0.04 | 0.19% |
| 6/27/2007 | $ 21.35 | $ 21.36 | $ 21.35 | $ 0.01 | 0.05% |
| 6/28/2007 | $ 21.21 | $ 21.27 | $ 21.21 | $ 0.06 | 0.28% |
| 6/29/2007 | $ 20.97 | $ 20.98 | $ 20.97 | $ 0.01 | 0.05% |
| 7/2/2007 | $ 20.45 | $ 20.46 | $ 20.45 | $ 0.01 | 0.05% |
| 7/3/2007 | $ 21.45 | $ 21.50 | $ 21.45 | $ 0.05 | 0.23% |
| 7/5/2007 | $ 22.11 | $ 22.15 | $ 22.15 | $ 0.04 | 0.18% |
| 7/6/2007 | $ 23.57 | $ 23.60 | $ 23.60 | $ 0.03 | 0.13% |
| 7/9/2007 | $ 23.37 | $ 23.39 | $ 23.39 | $ 0.02 | 0.09% |
| 7/10/2007 | $ 22.96 | $ 23.09 | $ 23.01 | $ 0.13 | 0.56% |
| 7/11/2007 | $ 23.84 | $ 23.92 | $ 23.91 | $ 0.08 | 0.33% |
| 7/12/2007 | $ 24.36 | $ 24.39 | $ 24.39 | $ 0.03 | 0.12% |
| 7/13/2007 | $ 24.34 | $ 24.35 | $ 24.35 | $ 0.01 | 0.04% |
| 7/16/2007 | $ 22.18 | $ 22.30 | $ 22.18 | $ 0.12 | 0.54% |
| 7/17/2007 | $ 21.39 | $ 21.41 | $ 21.39 | $ 0.02 | 0.09% |
| 7/18/2007 | $ 20.88 | $ 20.92 | $ 20.92 | $ 0.04 | 0.19% |
| 7/19/2007 | $ 21.68 | $ 21.72 | $ 21.72 | $ 0.04 | 0.18% |
| 7/20/2007 | $ 21.46 | $ 21.51 | $ 21.50 | $ 0.05 | 0.23% |
| 7/23/2007 | $ 21.57 | $ 21.61 | $ 21.63 | $ 0.04 | 0.18% |
| 7/24/2007 | $ 20.25 | $ 20.28 | $ 20.25 | $ 0.03 | 0.15% |
| 7/25/2007 | $ 19.19 | $ 19.21 | $ 19.21 | $ 0.02 | 0.10% |
| 7/26/2007 | $ 18.99 | $ 19.04 | $ 19.05 | $ 0.05 | 0.26% |
| 7/27/2007 | $ 18.65 | $ 18.71 | $ 18.71 | $ 0.06 | 0.32% |
| 7/30/2007 | $ 17.96 | $ 17.99 | $ 17.98 | $ 0.03 | 0.17% |
| 7/31/2007 | $ 16.90 | $ 16.93 | $ 16.95 | $ 0.03 | 0.18% |
| 8/1/2007 | $ 17.14 | $ 17.21 | $ 17.18 | $ 0.07 | 0.41% |
| 8/2/2007 | $ 16.79 | $ 16.88 | $ 16.84 | $ 0.09 | 0.53% |
| 8/3/2007 | $ 16.37 | $ 16.38 | $ 16.41 | $ 0.01 | 0.06% |
| 8/6/2007 | $ 15.68 | $ 15.75 | $ 15.75 | $ 0.07 | 0.44% |
| 8/7/2007 | $ 15.51 | $ 15.55 | $ 15.55 | $ 0.04 | 0.26% |
| 8/8/2007 | $ 16.38 | $ 16.46 | $ 16.38 | $ 0.08 | 0.49% |
| 8/9/2007 | $ 15.84 | $ 15.94 | $ 15.81 | $ 0.10 | 0.63% |
| 8/10/2007 | $ 15.53 | $ 15.54 | $ 15.54 | $ 0.01 | 0.06% |
| 8/13/2007 | $ 13.97 | $ 14.04 | $ 13.98 | $ 0.07 | 0.50% |
| 8/14/2007 | $ 13.28 | $ 13.38 | $ 13.37 | $ 0.10 | 0.75% |

**Flamel Technologies, SA**
Analysis of ADR Closing Bid/Ask Spread

| Date | Closing Bid | Closing Ask | Last Price | Bid/Ask Spread $ (1) | % (2) |
|------|------------|-------------|------------|----------------------|-------|
| 8/15/2007 | $ 12.92 | $ 13.00 | $ 13.00 | $ 0.08 | 0.62% |
| 8/16/2007 | $ 12.25 | $ 12.25 | $ 12.02 | $ - | 0.00% |
| 8/17/2007 | $ 12.23 | $ 12.28 | $ 12.24 | $ 0.05 | 0.41% |
| 8/20/2007 | $ 12.37 | $ 12.41 | $ 12.37 | $ 0.04 | 0.32% |
| 8/21/2007 | $ 12.46 | $ 12.50 | $ 12.49 | $ 0.04 | 0.32% |
| 8/22/2007 | $ 12.68 | $ 12.69 | $ 12.68 | $ 0.01 | 0.08% |
| **Class Period Average (3)** | | | | **$ 0.04** | **0.20%** |

(1)     $ Bid/Ask Spread = Closing Ask Price - Closing Bid Price
(2)     % Bid/Ask Spread = (Closing Ask Price - Closing Bid Price) / (Last Price)
(3)     05/16/2007 outlier data not considered in average as it appears to be either
        measurement error or reporting error

Source: Bloomberg

# Exhibit I

**Flamel Technologies, SA**
Reporting Institutional ADR Holdings

| Investor Name | 12/31/2006 | 3/31/2007 | 6/30/2007 | 9/30/2007 |
|---|---|---|---|---|
| A. Montag & Associates | 0 | 0 | 0 | 33,000 |
| Aberdeen Asset Management (Australia) | 0 | 7,961 | 11,072 | 11,108 |
| Allianz Global Investors Kapitalanlagegesellschaft mbH | 0 | 0 | 0 | 0 |
| Apex Capital, LLC | 0 | 125,000 | 0 | 0 |
| Apo Asset Management GmbH | 11,800 | 11,800 | 0 | 0 |
| ARICONSULT Fonds-Marketing GmbH | 3,800 | 3,800 | 0 | 0 |
| Ascend Capital, LLC | 240,400 | 0 | 0 | 0 |
| Baldwin Brothers Inc. | 163,705 | 219,790 | 252,740 | 50,865 |
| Balyasny Asset Management LP | 75,000 | 0 | 0 | 0 |
| Bank of America Merrill Lynch (US) | 8,087 | 0 | 0 | 0 |
| Bear Stearns Asset Management, Inc. | 0 | 9,145 | 35,306 | 60,817 |
| Bear, Stearns & Co. Inc. | 10 | 0 | 1,000 | 1,000 |
| Bedford Oak Advisors, L.L.C. | 0 | 100,000 | 0 | 0 |
| Biotechnology Value Fund, Inc. | 484,987 | 484,987 | 484,987 | 348,547 |
| BlackRock Advisors (UK) Limited | 0 | 25,400 | 51,623 | 400 |
| BlackRock Financial Management, Inc. | 0 | 200,000 | 0 | 0 |
| BlackRock Institutional Trust Company, N.A. | 237,824 | 206,142 | 206,722 | 174,943 |
| BlackRock Investment Management (UK) Ltd. | 0 | 50,000 | 0 | 0 |
| BNP Paribas Arbitrage SA | 0 | 0 | 0 | 15,725 |
| BNY Mellon Asset Management | 1,000 | 1,000 | 1,000 | 17,198 |
| Bourgeon Capital Management, LLC | 7,000 | 10,000 | 25,000 | 16,800 |
| Brown Capital Management, Inc. | 0 | 0 | 0 | 149,000 |
| Calypso Capital Management, L.P. | 0 | 650,000 | 0 | 0 |
| Capitalia Asset Management SGR S.p.A. | 1,000 | 0 | 0 | 0 |
| CCR Chevrillon-Philippe | 0 | 0 | 0 | 10,000 |
| Citadel Investment Group, L.L.C. | 202,596 | 278,968 | 78,776 | 119,581 |
| Citi Investment Research (US) | 12,993 | 46,794 | 23,184 | 68,410 |
| Clariden Leu | 0 | 0 | 0 | 0 |
| ClearBridge Advisors | 0 | 0 | 29 | 29 |
| Condor Capital Management, Inc. | 20,250 | 17,330 | 17,210 | 18,060 |
| CooperNeff Alternative Managers | 9,069 | 16,013 | 16,013 | 0 |
| Credit Suisse Asset Management, LLC (US) | 14,691 | 18,301 | 18,559 | 45,659 |
| Credit Suisse Securities (USA) LLC | 46,162 | 174,973 | 84,320 | 12,534 |
| D. E. Shaw & Co., L.P. | 148,400 | 84,582 | 215,844 | 67,924 |
| David J. Greene and Company, LLC | 0 | 0 | 0 | 0 |
| Denver Investment Advisors LLC | 0 | 0 | 287,800 | 0 |
| Deutsche Asset Management (Asia) Ltd. | 0 | 0 | 11,329 | 11,329 |
| Deutsche Asset Management Americas | 3,355 | 12,792 | 31,528 | 255,634 |
| Deutsche Bank Securities Inc. | 19,953 | 4,934 | 3,535 | 0 |
| Deutsche Investment Management Americas, Inc. | 401,500 | 459,000 | 647,100 | 642,700 |
| Dexia Asset Management Belgium S.A. | 0 | 0 | 37,000 | 37,000 |
| Driehaus Capital Management, LLC | 113,988 | 0 | 0 | 0 |
| DWS Investments | 7,403 | 0 | 0 | 0 |
| Eaton Vance Management | 0 | 92,000 | 100 | 100 |
| Ellington Management Group, L.L.C. | 0 | 0 | 55,000 | 0 |
| Enceladus Investment Management, LLC | 0 | 0 | 0 | 0 |
| FAF Advisors, Inc. | 665 | 1,665 | 10,450 | 2,300 |
| Ferris, Baker Watts Incorporated | 0 | 0 | 0 | 10,050 |
| Fidelity Management & Research | 74,000 | 0 | 0 | 100 |
| First Eagle Investment Management LLC | 0 | 0 | 0 | 50,000 |
| First Manhattan Company | 0 | 0 | 0 | 0 |
| Första AP-Fonden | 29,844 | 29,844 | 29,844 | 29,844 |
| Franklin Advisers, Inc. | 0 | 10,200 | 39,200 | 0 |
| Franklin Global Advisers | 0 | 0 | 210,400 | 229,200 |
| Geode Capital Management, L.L.C. | 0 | 2,271 | 2,133 | 2,131 |

**Flamel Technologies, SA**
Reporting Institutional ADR Holdings

| Investor Name | 12/31/2006 | 3/31/2007 | 6/30/2007 | 9/30/2007 |
|---|---|---|---|---|
| Glenhill Overseas Management, L.L.C. | 1,193,832 | 1,343,832 | 927,977 | 0 |
| Goldman Sachs & Company, Inc. | 7,354 | 16,944 | 32,267 | 257,543 |
| Greenlight Capital, Inc. | 1,547,045 | 1,626,045 | 1,887,008 | 1,887,008 |
| Grisanti, Brown & Partners LLC | 0 | 30,500 | 0 | 0 |
| Hauck & Aufhäuser Investment Gesellschaft S.A. | 40,000 | 40,000 | 20,000 | 20,000 |
| Highland Capital Management, L.P. | 0 | 0 | 0 | 970,700 |
| Hocky Management Company, L.L.C. | 0 | 0 | 182,001 | 0 |
| Hodges Capital Management, Inc. | 0 | 8,900 | 12,200 | 0 |
| Hollencrest Capital Management | 0 | 0 | 0 | 0 |
| Husic Capital Management | 67,544 | 60,989 | 0 | 0 |
| I - Methods | 0 | 0 | 12,500 | 12,500 |
| Invesco Aim Management Group, Inc. | 0 | 0 | 0 | 584,847 |
| Invesco PowerShares Capital Management LLC | 199,383 | 278,891 | 280,954 | 455,128 |
| J. Goldman & Co., L.P. | 0 | 0 | 0 | 100,000 |
| J. P. Morgan Ventures Corporation | 203,000 | 735,000 | 1,346,900 | 45,300 |
| Jefferies & Company, Inc. | 0 | 0 | 0 | 312,759 |
| Kenmare Capital Partners, L.L.C. | 460,200 | 0 | 0 | 0 |
| Knoll Capital Management, L.L.C. | 2,117,119 | 1,993,238 | 2,003,238 | 2,053,238 |
| LaBranche Structured Products, L.L.C. | 58,698 | 0 | 44,047 | 63,393 |
| Lazard Asset Management, L.L.C. | 0 | 7,961 | 11,072 | 11,108 |
| Lehman Brothers Inc. | 0 | 12,025 | 64,269 | 14,083 |
| Medical Strategy GmbH | 4,100 | 4,100 | 0 | 0 |
| Merrill Lynch & Company, Inc. | 43,907 | 77,214 | 48,524 | 32,581 |
| MFC Global Investment Management (US), LLC | 0 | 110,544 | 314,800 | 455,358 |
| Millennium Management, L.L.C. | 46,120 | 172,309 | 18,621 | 19,146 |
| Morgan Stanley & Co. Inc. | 19,774 | 683,436 | 116,305 | 12,194 |
| Morgan Stanley Investment Management Inc. (US) | 1,370,361 | 278,585 | 0 | 0 |
| Morgan Stanley Investment Management Ltd. (UK) | 29,844 | 6,633 | 0 | 0 |
| Nanostart AG | 410 | 410 | 410 | 410 |
| Natixis Arbitrage | 0 | 0 | 0 | 137,423 |
| Neuberger Berman, LLC | 6,850 | 8,150 | 0 | 0 |
| nordaktienbank AG | 0 | 0 | 3,500 | 3,500 |
| Nordinvest Norddeutsche Investment-Gesellschaft mbH | 0 | 3,000 | 3,000 | 3,000 |
| Northeast Investment Management, Inc. | 1,775 | 3,275 | 4,675 | 6,200 |
| O.S.S. Capital Management, LP | 4,081,447 | 5,566,047 | 5,686,047 | 6,246,047 |
| Oppenheim Kapitalanlagegesellschaft mbH | 2,360 | 2,360 | 0 | 0 |
| Oppenheimer Asset Management Inc. | 0 | 14,000 | 13,000 | 13,700 |
| Origin Capital Management, L.L.C. | 11,080 | 0 | 0 | 0 |
| P.A.W. Partners | 202,500 | 184,800 | 169,400 | 0 |
| Paloma Partners Management Company | 0 | 11,886 | 10,019 | 0 |
| Peak 6 Capital Management, LLC | 37,560 | 0 | 26,410 | 8,377 |
| Perceptive Advisors LLC | 10,900 | 57,000 | 0 | 0 |
| Pilot Advisors, L.P. | 0 | 1,000 | 1,000 | 0 |
| Pioneer Investments Kapitalanlagegesellschaft mbH | 0 | 3,000 | 3,000 | 3,000 |
| Quantlab Capital Management, Ltd. | 800 | 3,444 | 5,212 | 0 |
| RBC Asset Management, Inc. | 0 | 200 | 0 | 800 |
| RBC Capital Markets Wealth Management | 600 | 500 | 47,125 | 47,200 |
| Renaissance Technologies Corp. | 25,668 | 67,768 | 76,668 | 0 |
| Robeco Investment Management, Inc. | 0 | 0 | 10,300 | 0 |
| Roxbury Capital Management, L.L.C. | 586,013 | 704,100 | 776,402 | 0 |
| RS Investments | 59,300 | 3,500 | 0 | 0 |
| S.A.C. Capital Advisors, LP | 0 | 210,578 | 0 | 0 |
| Salzman Capital Management, L.L.C. | 0 | 0 | 40,000 | 15,000 |
| Securities Management and Research, Inc. | 0 | 900 | 0 | 0 |
| Selz Capital, LLC | 684,300 | 761,600 | 1,075,600 | 685,600 |

**Flamel Technologies, SA**
Reporting Institutional ADR Holdings

| Investor Name | 12/31/2006 | 3/31/2007 | 6/30/2007 | 9/30/2007 |
|---|---|---|---|---|
| Serengeti Asset Management LP | 0 | 0 | 0 | 0 |
| SG Americas Securities, L.L.C. | 0 | 0 | 55,198 | 0 |
| Silver Point Capital, L.P. | 0 | 0 | 0 | 0 |
| Somerville Trading Enterprises, LLC | 0 | 0 | 0 | 306,034 |
| Stark Investments | 0 | 0 | 0 | 593,006 |
| State Teachers Retirement System of Ohio | 0 | 0 | 0 | 0 |
| TD Options, LLC | 3,964 | 13,254 | 79 | 2,389 |
| Templeton Investment Counsel, LLC | 0 | 49,300 | 183,100 | 0 |
| Tewksbury Capital Management Ltd. | 43,302 | 40,395 | 0 | 0 |
| The Pennsylvania Trust Company | 0 | 0 | 0 | 21,700 |
| Third Point, L.L.C. | 250,000 | 225,000 | 920,000 | 0 |
| Trellus Management Company, LLC | 0 | 170,000 | 0 | 0 |
| Tribeca Global Management, L.L.C. | 70,000 | 60,000 | 80,000 | 0 |
| Two Sigma Investments, LLC | 6,800 | 25,502 | 21,100 | 0 |
| UBS Securities LLC | 8,228 | 130,973 | 14,708 | 247,410 |
| Van Kampen Asset Management | 67,967 | 15,047 | 0 | 0 |
| Water Street Capital, Inc. | 405,000 | 405,000 | 405,000 | 414,100 |
| Wedbush Morgan Securities, Inc. | 0 | 0 | 0 | 0 |
| Wells Fargo Bank, N.A. | 540 | 40 | 40 | 40 |
| Westport Resources Management, Inc. | 0 | 0 | 1,000 | 1,000 |
| Wexford Capital LLC | 10,000 | 0 | 0 | 0 |
| Wilmington Trust Investment Management LLC | 0 | 5,120 | 4,760 | 0 |
| Wyper Capital Management, L.P. | 29,964 | 0 | 0 | 0 |
| Zebra Capital Management, L.L.C. | 0 | 0 | 79,540 | 0 |
| | | | | |
| **Total** | **16,355,091** | **19,588,987** | **19,927,780** | **18,554,810** |
| | | | | |
| Shares Outstanding | 23,990,590 | 23,990,590 | 24,041,590 | 24,041,590 |
| | | | | |
| Institutional % of Shares Outstanding | 68.17% | 81.65% | 82.89% | 77.18% |

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that January 22, 2010, I caused a true and

correct copy of the attached:

Notice of Motion for Class Certification, Certification of Class Representatives and Appointment of Class Counsel;

Memorandum of Law in Support of Motion for Class Certification, Certification of Class Representatives and Appointment of Class Counsel; and

Declaration of Michael A. Marek

to be served electronically on all counsel registered for electronic service for this case.

*/s/ David A. Rosenfeld*
David A. Rosenfeld