UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

CHRISTEL BILLHOFER, On Behalf of
Herself and All Others Similarly
Situated,

                    Plaintiff,              07 Civ. 9920

    -against-                               OPINION

FLAMEL TECHNOLOGIES, S.A., et al.,

                    Defendants.

----------------------------------------X

A P P E A R A N C E S:

    <u>Attorneys for the Plaintiff</u>

    ROBBINS GELLER RUDMAN & DOWD LLP
    58 South Service Road, Suite 200
    Melville, NY  11747
    By:  Samuel H. Rudman, Esq.
        David A. Rosenfeld, Esq.
        Jarrett S. Charo, Esq.

    BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP
    280 King of Prussia Road
    Radnor, PA  19087
    By:  Stuart L. Berman
        Lauren W. Pederson, Esq.
        Neena Verma, Esq.

    <u>Attorneys for the Defendants</u>

    HOGAN LOVELLS US LLP
    875 Third Avenue
    New York, NY  10022
    By:  Steven M. Edwards, Esq.
        David Wertheimer, Esq.
        Peter J. Dennin, Esq.

**Sweet, D.J.**

Lead Plaintiff George Jenkins ("Plaintiff" or "Proposed Class Representative") has moved pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure for class certification, certification of class representative, and appointment of class counsel.

Based on the facts and conclusions set forth below, Plaintiff's motion is granted, the class and class representatives are certified and co-class counsel are appointed.

## I. Prior Proceedings

The complaint in this putative class action, alleging securities fraud against Flamel Technologies S.A. ("Flamel") and four of its principals (collectively "Defendants"), was filed on November 9, 2007. This action arose out of the March 2007 commercial launch of COREG CR, a drug developed by GlaxoSmithKline ("GSK"), which employed Flamel's "micropump" for drug delivery. COREG CR was intended to supplant COREG IR, another drug GSK had developed but whose patent exclusivity was

expiring in September 2007, exposing it to generic competition. The primary advantage of COREG CR over COREG IR was that CR (for "controlled release") allowed for once daily dosages compared with IR (for "immediate release") which required twice daily dosages.

Both before and during the proposed class period, from March 23, 2007 to August 22, 2007 (the "Class Period"), a number of clinical studies relating to COREG CR were conducted. One of those studies, known as the "CASPER" trial, compared patients' compliance with their doctors' prescriptions using COREG IR versus COREG CR. The CASPER trial found no statistically significant difference in patients' compliance rates. Plaintiff identifies certain positive statements regarding COREG CR made during the Class Period and alleges that Defendants knew or recklessly disregarded the CASPER trial results. Plaintiff alleges that the abstract of the CASPER trial was published in the Journal of Cardiac Failure on or about August 23, 2007. According to the Amended Complaint, Flamel's ADR price dropped from $12.68 to $9.56 per share on August 23, 2007 in response to this news.

On February 11, 2008, the Honorable Charles S. Haight appointed plaintiff Christel Billhofer ("Billhofer") as Lead Plaintiff in this action and appointed the law firm of Coughlin Stoia Geller Rudman Robbins LLP[1] ("Coughlin Stoia") as Lead Counsel.  On March 27, 2008, Plaintiff filed a First Amended Complaint.  On October 5, 2009, Judge Haight denied Defendants' motion to dismiss.  See Billhofer v. Flamel Techs., SA, 663 F. Supp. 2d 288 (S.D.N.Y. 2009).  The action was subsequently reassigned.

On January 22, 2010, Billhofer filed a motion for class certification, her certification as class representative, and appointment of Coughlin Stoia as class counsel.  After filing the motion, Billhofer advised that she would no longer be able to serve in a representative capacity on behalf of the proposed class and thus Defendants did not file opposing briefs, nor did the Court rule, on Billhofer's certification motion.

On April 29, 2010, Billhofer moved, inter alia, to withdraw as Lead Plaintiff, substitute Jenkins in her stead, and approve Jenkins' selection of the law firm of Barroway Topaz as co-lead counsel.  On June 23, 2010, the claims against

---

[1]    Effective March 31, 2010, the firm of Coughlin Stoia changed its name to Robbins Geller Rubman & Dowd LLP ("Robbins Geller").

individual defendant Rafael Jorda were voluntarily dismissed. On September 21, 2010, the Court granted Billhofer's motion for substitution and on October 1, 2010, appointed Barroway Topaz as co-lead counsel.

The instant motion was heard on September 21, 2011.

## II. The Facts

The following facts are drawn from affidavits submitted and are not in dispute except as noted below.

During the Class Period, Flamel had at least 23 million American Depository Receipts ("ADRs") outstanding, owned by hundreds if not thousands of persons, with such ADRs actively trading on the NASDAQ Stock Market ("NASDAQ"). There were between 71 and 82 institutional investors who are members of the putative Class. During the Class Period, Flamel had an average weekly trading volume of at least 9.2% of outstanding shares.

During the Class Period, Flamel was followed by numerous securities analysts employed by major brokerage firms. Eight separate firms issued reports about Flamel and four

4

additional firms (including Merrill Lynch) participated in investor conference calls hosted by Flamel and more than two dozen articles and press releases were published about Flamel.

Flamel had at least 41 companies serving as market makers on the NASDAQ for its stock during the Class Period. This number of market makers was almost twice the average number of market makers for all NASDAQ securities during the same time period. From March through August, 2007, the average number of market makers for all NASDAQ securities was 21. This average includes market makers who accounted for less than one percent of a security's activity. During this same period, 21 market makers each accounted for at least one percent of the NASDAQ activity in Flamel ADRs. Another 20 market makers each accounted for less than one percent of NASDAQ activity in Flamel.

During the Class Period, Flamel met the two market efficiency-related requirements of Form S-3 – at least a 12-month reporting history and a minimum $75 million in public float. During that time, Flamel's total market capitalization ranged from $288 million to $717 million. The vast majority (i.e., more than 99.4%) of Flamel's ADRs were held by the

public, as opposed to by insiders.  At its lowest point during the Class Period, Flamel's public float exceeded $286 million. Flamel was eligible to file, and in 2003 did file, a Form F-3, the foreign entity's functional equivalent of the Form S-3. See, e.g., In re SCOR Holding (Switzerland) AG Litig., 537 F. Supp.2d 556, 578 n.35 (S.D.N.Y. 2008) ("as a foreign issuer, the equivalent [of a Form S-3] would have been a Form F-3"); see also Form S-3, 17 C.F.R. § 239.13; Form F-3, 17 C.F.R. § 239.33 (both requiring a twelve-month reporting history and $75 million in market capitalization).  During the Class Period, the average bid-ask spread for Flamel was 0.198%.

On August 23, 2007, the day on which an abstract of the CASPER Trial was published, the price of Flamel ADRs fell by 24.6% percent, while the NASDAQ Composite Index and the NASDAQ Biotechnology Index decreased by 0.43 percent and 0.14 percent, respectively.

Ten days earlier, on August 13, 2007, the CASPER abstract was placed on a subpage of a conference supplement on the website of the Journal of Cardiac Failure.  The conference supplement contained the results of over 400 different clinical trials and did not mention Flamel.  The CASPER abstract was

6

number 209 of those abstracts.  The record does not establish who was responsible for online posting for The Journal of Cardiac Failure in 2007 and the records of Elsevier, Inc., the publisher of the Journal of Cardiac Failure, do not reflect the online posting of the Supplement on August 13, 2007.  It has not been established that receipt of any of the bulk mailing of approximately 2,750 copies of the Conference Supplement to subscribers of the Journal of Cardiac Failure occurred before August 23, 2007.

Matthew Kaplan ("Kaplan"), an analyst following Flamel, discovered a copy of the CASPER abstract on August 20, 2007 but was unable to state with certainty if he had found the abstract through his internet searching or through his searching directly on the website of the Heart Failure Society of America. Kaplan reported his findings about the CASPER abstract to Defendant Stephen Willard ("Willard"), Chief Executive Officer of Flamel, and Charles Marlio ("Marlio"), Flamel's Director of Strategic Planning and Investors Relations, by email on August 20, 2007.  Kaplan testified at his deposition that he does not believe that he forwarded the summary of the results of the CASPER trial to anyone else prior to August 23, 2007. Kaplan

7

published a research report discussing the abstract on August 24, 2007.

Two analysts who followed Flamel, Michael Higgins and E. Russell McAllister, located the CASPER abstract on the Journal of Cardiac Failure website on August 23, 2007, and published the CASPER results that same day. The results of the trial were widely reported that day. An email sent by Willard to several members of Flamel's Board of Directors and executive officers on August 24, 2007 stated: "We had a rather busy day in Flamel shares yesterday. We traded more than 9.9 million shares, lost 24.61% of our already diminished value, and ended the day at $9.56. The reason for the decline was the release of an abstract . . . regarding a study entitled . . . The CASPAR [sic] Trial." (Rosenfeld Decl. Ex L (Dkt. No. 84).) In the same email, Willard noted that he had been in meetings with GSK on August 21, 2007 but was not given a "heads up" by GSK that the results of CASPER were coming out. (Id.)

## III. The Standard For Class Certification

"Class certification is warranted under Rule 23 where the proposed class representative meets the standards of Rule

23(a) – numerosity, commonality, typicality, and adequacy – and the proposed class action meets the requirements of one of the subsections of Rule 23(b)." In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 478 (2d Cir. 2008). The four prerequisites of Rule 23(a) are as follows:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Plaintiff has moved under Rule 23(b)(3), which provides for class certification if the requirements of Rule 23(a) are met and:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The Second Circuit has described the standard of proof governing class certification as follows:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement . . . .

In re Initial Public Offering Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006). "'[T]he standard of proof applicable to evidence proffered to meet' the requirements of Rule 23 [is] a 'preponderance of the evidence.'" In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008)).

In determining whether class certification is appropriate in a securities action, the Second Circuit has "directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation." Maywalt v.

Parker & Parsley Petroleum Co., 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (citations omitted) (citing Korn v. Franchard Corp., 456 F.2d 1206, 1209 (2d Cir. 1972); Green v. Wolf Corp., 406 F.2d 291, 298, 301 (2d Cir. 1968), cert. denied, 395 U.S. 977 (1969)). Thus, "the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action." Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985) (citation and quotation marks omitted), cert. denied, 474 U.S. 946 (1985).

## IV. The Rule 23 Standard Has Been Met

Plaintiff seeks an order (i) certifying this action as a class action on behalf of those who acquired Flamel ADRs between March 23, 2007[2] and August 22, 2007 and were damaged thereby, excluding defendants Flamel and Stephen Willard, members of their immediate families, and their affiliates or agents; (ii) certifying Jenkins as class representative; and (iii) appointing lead counsel Robbins Geller and Barroway Topaz as co-class counsel.

---

[2]   According to the Amended Complaint, on March 23, 2007 Flamel issued a press release announcing the nationwide availability of COREG CR.

Defendants do not contest that Plaintiff has met the prerequisites of Rule 23(a), challenging only whether questions of fact common to class members predominate as to both reliance and loss causation under Rule 23(b)(3).

## A. Numerosity

For class certification to be appropriate, the proposed class must be so numerous that joinder of all of its individual members would be impracticable. See Fed. R. Civ. P. 23(a)(1); In re NYSE Specialists Sec. Litig., 260 F.R.D. 55, 69-70 (S.D.N.Y. 2009). "The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible – only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 504 F.3d 229, 244-45 (2d Cir. 2007); see also In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 508 (S.D.N.Y. 1996). "Numerosity is presumed when a class consists of forty members or more." NYSE Specialists, 260 F.R.D. at 70 (citing Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)); see also In re Sadia, S.A. Sec. Litig., 269 F.R.D. 298, 304 (S.D.N.Y. 2010)

("Sufficient numerosity can be presumed at a level of forty members or more." (citation omitted)).

Here, the proposed class far exceeds 40 members. This number excludes smaller and individual investors, who will only add to the size of the class.

B. Commonality

Rule 23(a)(2) demands the existence of common questions of law or fact between members of the class. However, "[c]ommonality does not mandate that all class members make identical claims and arguments" or that the circumstances of their securities purchase be identical. Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 198 (S.D.N.Y. 1992) (citing Port Auth. Police Benevolent Ass'n v. Port Auth., 698 F.2d 150, 153-54 (2d Cir. 1983)). "The commonality requirement has been applied permissively by courts in the context of securities fraud litigation, and minor variations in the class members' positions will not suffice to defeat certification." Dietrich v. Bauer, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) (citations omitted).

13

Common questions of law and fact are present where, as here, the alleged fraud involves material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls. See, e.g., Darquea v. Jarden Corp., No. 06 Civ. 722, 2008 WL 622811, at *2 (S.D.N.Y. Mar. 6, 2008) ("The alleged misrepresentation leading to artificially inflated stock prices relate to all the investors and the existence and materiality of such misstatements or omissions present important common issues."); In re Frontier Ins. Group Sec. Litig., 172 F.R.D. 31, 40 (E.D.N.Y. 1997) (disseminating statements that omitted or misrepresented material facts deemed common questions).

The misrepresentations and omissions alleged here are of the sort that courts routinely hold to satisfy the "common question" requirement. See, e.g., In re Interpublic Sec. Litig., No. 02 Civ. 6527, 2003 WL 22509414, at *3 (S.D.N.Y. Nov. 6, 2003) (plaintiffs raised common issues of law and fact, including whether defendants' "public filings and statements contained material misstatements, whether the defendants acted knowingly or with reckless disregard for the truth in misrepresenting material facts in [defendants'] public filings

14

and press releases, and whether the damages to the investors were caused by the defendants' misstatements").

The alleged misrepresentations and scienter, which form the basis of Plaintiff's claims, are necessarily common to all members of the proposed class.

The commonality requirement is thus satisfied.

C. Typicality

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Cent. States, 504 F.3d at 245 (quoting Robinson v. Metro-N. Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001)). Typicality may be found to fail in cases where the named plaintiff was not harmed by the conduct alleged to have injured the class. Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 64 (S.D.N.Y. 2006).

Plaintiff's claims here are more than sufficiently similar to meet the typicality requirement. All members of the class seek to prove that Defendants made materially false and misleading statements during the Class Period and failed to disclose material adverse facts about COREG CR. Plaintiff and the other members of the Class are alleged to have been injured by the same course of conduct by Defendants. Moreover, the damages that they seek arise from the purchase of Flamel ADRs at prices that are alleged to have been artificially inflated as a result of Defendants' allegedly false and misleading statements and omissions, and the subsequent decline in the price of Flamel's ADRs when aspects of the alleged fraud were revealed. Thus, Plaintiff stands in the same position as other purchasers of Flamel's ADRs during the Class Period.

The claims here "arise[] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Cent. States, 504 F.3d at 245 (quotation marks and citation omitted). Typicality is thus satisfied here.

D. Adequacy

16

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, 222 F.3d 52, 60 (2d Cir. 2000) (citing In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992)); see also NYSE Specialists, 260 F.R.D. at 73.

The first prong of this analysis "serves to uncover conflicts of interest between named parties and the class they seek to represent" and ensure that the proposed class representative possesses "the same interest and suffer[ed] the same injury as the class members." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625-26 (1997). Here, none of Plaintiff's interests are antagonistic to those of the proposed class. As discussed above, all members of the proposed class allege claims arising from the same wrongful conduct that are based on the same legal theories as Plaintiff's claims. See Darquea, 2008 WL 622811, at *3 ("All claims alleged arise from the same wrongful conduct, and thus, Plaintiff's interests, recouping money

17

invested, are similar to those of the proposed class. As such, named Plaintiffs will fairly and adequately protect the interests of the class."). Therefore, the interests of the other members of the proposed class will be adequately protected by Plaintiff.

As to the second prong regarding adequacy of counsel, Plaintiff has retained the law firms of Robbins Geller and Barroway Topaz to represent him and the proposed class in this matter. As this Court has previously found, "[g]iven [Robbins Geller's] substantial experience in securities class action litigation . . . the element of adequacy has also been satisfied." NYSE Specialists, 260 F.R.D. at 74. Among other noteworthy securities fraud cases, Robbins Geller has served as lead counsel in In re Enron Corp. Sec., Derivative & "ERISA" Litig., No. H-01-3624 (S.D. Tex.). Specifically, commenting on counsel's "clearly superlative litigating and negotiating skills" and the firm's "outstanding reputation, experience, and success in securities litigation nationwide," the Enron court stated, "[t]he experience, ability, and reputation of the attorneys of [Robbins Geller] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country." In re Enron Corp. Sec.

Derivative & "ERISA" Litig., No. H-01-3624, 2008 WL 4178130, at
*40, *41, *46 (S.D. Tex. Sept. 8, 2008).  Indeed, courts within
this Circuit have repeatedly found Robbins Geller to be adequate
and well-qualified for the purposes of litigating class action
lawsuits.    Similarly, a court in this district recently found
that the attorneys of "Barroway Topaz have extensive experience
in securities litigations and have successfully prosecuted
numerous securities fraud class actions on behalf of injured
investors" and that they were "qualified, experienced and able
to conduct the litigation."  In re Sadia, 269 F.R.D. at 310
(citations and internal quotation marks omitted).

        Thus, Robbins Geller and Barroway Topaz are qualified
to represent the proposed class and, along with Plaintiff, will
vigorously protect the interests of class members.  Accordingly,
the requirements of Rule 23(a)(4) are satisfied.


        E. Common Questions of Law or Fact


        In addition to meeting the requirements of Rule 23(a),
the present action also satisfies the requirements of Rule
23(b)(3).    Rule 23(b)(3) requires a proposed class
representative to establish that common questions of law or fact

19

predominate over any questions affecting only individual members, and that a class action is superior to other available means of adjudication. Here, common questions of law and fact predominate, and a class action is the superior method available to litigate this suit fairly and efficiently.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., 521 U.S. at 623. It is a more demanding criterion than the commonality inquiry under Rule 23(a). Id. at 623-24. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002) (citation omitted). This Court has echoed the Supreme Court's acknowledgement that the predominance requirement "'is a test readily met in certain cases alleging . . . securities fraud.'" NYSE Specialists, 260 F.R.D. at 75 (quoting Amchem Prods., 521 U.S. at 625); see also Darquea, 2008 WL 622811, at *5 (holding that "a scheme to release material misrepresentations and omitting important investor information,

resulting in artificially inflated prices . . . constitutes a common course of conduct").

To prevail on a claim for securities fraud, a plaintiff must show "both transaction causation (also known as reliance) and loss causation." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106 (2d Cir. 2007). Transaction causation requires a plaintiff to demonstrate that "'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" Id. (quoting Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005)); accord In re Omnicom Group, Inc. Sec. Litig., 597 F.3d 501, 509-10 (2d Cir. 2010). Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm." ATSI, 493 F.3d at 106-07 (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346 (2005); Lentell, 396 F.3d at 172); accord Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).

In Basic Inc. v. Levinson, the Supreme Court held that an investor may invoke a rebuttable presumption of reliance in cases of public material misrepresentations. 485 U.S. 224, 247 (1988). Under Basic, an investor may avail himself of the

21

presumption that he "relied on the integrity of the price set by the market" if the market is efficient. Id. at 227. "Because most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." Id. at 247; accord Hevesi v. Citigroup Inc., 366 F.3d 70, 77 (2d Cir. 2004) ("The fraud-on-the-market doctrine, as described by the Supreme Court in Basic v. Levinson, creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value. This presumption, if unrebutted, thus allows plaintiffs to satisfy the element of reliance in securities fraud claims under the 1934 Act." (citations omitted)). As long as the "plaintiffs can show that the alleged misrepresentation was material and publicly transmitted into a well-developed market, then reliance will be presumed." In re Salomon Analyst, 544 F.3d at 483. The Second Circuit recently clarified that plaintiffs do not bear the burden of showing an impact on price in order to invoke the fraud on the market presumption. See In re Salomon Analyst, 544 F.3d at 482-83. "The point of Basic is that an effect on market price is presumed based on the materiality of

information and a well developed market's ability to readily incorporate that information into the price of securities." Id. at 483 (emphasis in original).

"Thus, in order to invoke the fraud-on-the-market presumption, a plaintiff must establish that the security at issue traded in a market that reflected all publicly available information, and, hence, any material misrepresentations. Such a market is commonly referred to as an 'efficient' market." In re SCOR Holding, 537 F. Supp. 2d at 574 (citations and internal quotations omitted). The fraud-on-the market doctrine's presumption of reliance applies where plaintiffs "demonstrate that material misrepresentations were publicly disseminated and that [defendant's] shares traded in an efficient market." Fogarazzo v. Lehman Bros., Inc., 263 F.R.D. 90, 102 (S.D.N.Y. 2009) (citations omitted); see also Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 182 (S.D.N.Y. 2008). "[T]he Basic presumption does not require a perfectly efficient market, only a market efficient enough to incorporate information into the share price with reasonable speed." In re Initial Public Offering Sec. Litig., 260 F.R.D. 81, 102 (S.D.N.Y. 2009).

23

Here, reliance is a question common to all proposed class members and Plaintiff relies on the fraud-on-the-market doctrine. Accordingly, to benefit from the fraud-on-the market doctrine's presumption of reliance, Plaintiff must demonstrate that the market for Flamel's ADRs was efficient. See Fogarazzo, 263 F.R.D. at 102 n.83; In re Sadia, 269 F.R.D. at 307. Without the Basic presumption, Plaintiff would be required to prove reliance on an individual basis, and the proposed class action would not satisfy the predominance requirement of Rule 23(b)(3).

"At the class certification stage, the securities' trading record may create certain rebuttable legal presumptions about market efficiency. If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient." Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., No. 05 Civ. 1898, 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006) (collecting cases), aff'd, 546 F.3d 196 (2d Cir. 2008). Here, Flamel's ADRs traded on the NASDAQ.

However, Defendants have challenged the efficiency of the market for Flamel's ADRs during the Class Period, and that

issue has been the subject of expert submissions as discussed below.


i. The Flamel ADR Market Was Efficient


The Second Circuit has yet to articulate the factors by which a court may assess market efficiency. However, in addressing this question courts often look to the five factors utilized in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989). See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 204 n.11 (2d Cir. 2008) ("The Cammer factors have been routinely applied by district courts considering the efficiency of equity markets. . . . This Court has not adopted a test for the market efficiency of stocks or bonds, and we do not do so here.")  Cammer considered the following factors: (1) whether the security traded at a large average weekly volume; (2) whether a significant number of analysts followed and reported on the security; (3) whether the security had numerous market makers; (4) whether the company was eligible to file SEC Form S-3; and (5) whether there are empirical facts showing a cause and effect relationship between unexpected corporate events or financial information releases, and an immediate response in the security's price. 711 F. Supp. at 1286-87.

In addition to the five _Cammer_ factors, courts have also looked at three factors to analyze market efficiency enumerated in _Krogman v. Sterritt_, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001). _See, e.g._, _Teamsters Local 445_, 2006 WL 2161887, at *5. The three _Krogman_ factors are (1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float – i.e., the degree to which shares of the security are held by the public, rather than insiders. 202 F.R.D. at 477-78. These factors should be used as an analytical tool rather than as a checklist. _Unger v. Amedisys Inc._, 401 F.3d 316, 325 (5th Cir. 2005).

The facts set forth above establish active trading with multiple market makers, coverage of Flamel by analysts, F-3 regulations with reporting history and float substantially exceeding $75 million, as well as substantial market capitalization with a narrow bid-ask spread, and a large public float. All of these factors strongly indicate that Flamel ADRs traded in an efficient market such that the _Basic_ presumption is appropriate.

The only substantial opposition to the market efficiency of Flamel ADRs offered by the Defendants arises out of the timing of the disclosure of the CASPER trial as well as the statistical arguments of their expert.

According to Defendants, the abstract that contained a summary of the adverse results of the CASPER trial was posted on a website in a clinical trial supplement along with over 400 hundred other abstracts approximately ten days prior to August 23, 2007, the day which, according to the Amended Complaint, the CASPER trial was first disclosed to the market, leading to a one-day price decline of 24.6%.  Defendants contend that this earlier posting and the related price changes in Flamel's ADRs demonstrate that the market for Flamel ADRs was not efficient.

However, no investor has been identified that was aware that this abstract had been posted by August 13, 2007 and Willard's email to his board of directors established that he was unaware that the abstract had become public prior to August 23, 2007.  Basic does not require a perfectly efficient market or require a court to draw purely academic and unfounded conclusions regarding the spread of information.  The results of the CASPER trial were not "publicly available" simply because

27

they were posted in an obscure location on the internet. The CASPER trial results became publicly available when an analyst, E. Russell McAllister, at Merriman Curhan Ford issued a research report on the disappointing clinical results. The Flamel ADRs then declined by $3.12 per share and 9.9 million shares changed hands. Defendants' argument that that the efficiency of the market for Flamel's ADRs is undermined by the August 13, 2007 posting is therefore rejected.

Second, Defendants challenge the statistical analysis performed by Plaintiff's expert, Michael Marek ("Marek"). Specifically, Marek performed a serial autocorrelation test of the price of Flamel's ADRs during the Class Period. The autocorrelation analysis tests for the presence of a statistical relationship between price changes (also known as returns) on successive trading dates. Serial autocorrelation exists if one can reliably predict the direction of today's return from knowledge of yesterday's return.

In this regard, Marek's declaration states as follows:

9. The concept of an "efficient" market evolved from the Ph.D. dissertation of Eugene Fama. Dr. Fama made the argument that, in an active market that includes many well-informed and intelligent investors, securities prices will reflect all available

information.   If the market is efficient, an investment methodology for choosing a portfolio of securities cannot be expected to consistently outperform an appropriate comparative benchmark – for example, a randomly selected portfolio of securities with a similar risk profile.

10.   The Efficient Market Hypothesis (the "EMH") postulates there are three forms of market efficiency – weak, semi-strong and strong.   The three forms of efficient markets are distinguished by the degree of information reflected in securities prices.

11. The weak form postulates that stock prices reflect information about their past prices, and is widely accepted by market participants. If markets are weak-form efficient, it is impossible to earn consistent profits by studying past returns alone.   The market is said to "have no memory" regarding past stock prices. One common methodology for determining whether the market for a security is weak-form efficient is to graphically and statistically analyze price changes on successive days.   As shown below, during the Class Period, there was no significant relationship between Flamel's ADRs price returns on successive days.   That is, the movement in Flamel's ADRs on one day was not predictive of its movement on the next day.

12. To illustrate this, the graph attached as Exhibit C contains a pattern of paired returns for a hypothetical security which exhibits "autocorrelation," that is, a statistical relationship between the price changes on successive trading dates. If the price of this hypothetical security rose on Tuesday, it was extremely likely that the price would rise on Wednesday as well.   If the price of this security fell on Tuesday, it was extremely likely that the price would fall on Wednesday as well.   This predictability is a sign of potential market inefficiency.

13. During the Class Period, Flamel ADRs were traded on the NASDAQ Stock Market ("NASDAQ"), specifically on the NASDAQ Global Market ("NASDAQ GM") under the ticker symbol FLML.   The graph attached as Exhibit D contains "paired returns" for Flamel ADRs during the

Class Period. As can be seen in this graph, there is no discernable pattern in the price changes of Flamel ADRs on successive trading days. If the price of Flamel ADRs rose (or fell) on Tuesday, it was as likely to fall (or rise) on Wednesday. In other words, Flamel's stock price followed a "random walk" and thus there was no reliable way to predict the following day's price change based simply on the stock price return today.

14. Statistically, results of the regression analysis of these two variables (the "Y" or "dependent" variable set equal to the daily percentage changes in the price of Flamel ADRs during the Class Period; and the "X" or "independent" variable set equal to the prior trading day's daily percentage changes) indicate insignificant correlation, as shown in the following statistical summary:

```
x = Change in Flamel ADR on day t
y = Change in Flamel ADR on day t-1
```

**Regression Statistics**

| | |
|---|---|
| Multiple R | 16.3369% |
| R Square | 2.6689% |
| **Adjusted R Square** | **1.7331%** |
| Standard Error | 3.1747% |
| Observations | 106 |

[Analysis of Variance]

| | df | SS | MS | F |
|---|---|---|---|---|
| Regression | 1 | 0.00287421 | 0.00287421 | 2.851810835 |
| Residual | 104 | 0.104816872 | 0.001007855 | |
| Total | 105 | 0.107691082 | | |

| | Coefficients | Standard Error | t Stat | P-value |
|---|---|---|---|---|
| Intercept | -0.006272258 | 0.003179089 | -1.97297342 | 0.05115254 |
| X Variable 1 | 0.163435132 | 0.096779876 | 1.688730539 | 0.094267349 |

(Marek Decl. 5-8 (citations omitted) (Dkt. No. 25).)

     As stated in often-cited finance text:

> If markets are efficient in the weak sense, then it is impossible to make consistently superior profits by studying past returns. Prices will follow a random walk.

(Marek Reply Decl. 8 (citation omitted) (Dkt. No. 84-1).)

     Defendants' expert, Dr. Allan Kleidon ("Kleidon") has asserted that Marek only investigated positive autocorrelation and that Marek's analysis demonstrates that if only positive autocorrelation is considered, positive autocorrelation cannot be rejected at a 95% confidence level. (Kleidon Report ¶ 50 (Dkt. No. 78).) In plainer English, Defendants argue that if Marek was testing only to exclude the possibility that knowledge of today's return on Flamel's ADRs increased correlates with an increase tomorrow -- or that a price decrease today correlates with a decrease tomorrow -- at a 5% level of statistical significance, Marek did not do so.

     However, review of Marek's statistical analysis shows that he in fact utilized a two-tailed test, thus considering

both positive and negative[3] autocorrelation.  Specifically, the two figures at the bottom right of Marek's statistical summary of a t statistic of 1.688730539 and corresponding P-value of 0.094267349, translate to a two-tailed test showing no statistically significant correlation at the 95% confidence level.  Accordingly, using a two-tailed test, Marek found that at a 5% level of statistical significance, the hypothesis that knowledge of today's return on Flamel's ADRs correlates (either positively or negatively) with tomorrow's return must be rejected.  Defendants do not dispute that if a two-tailed test is used, Marek's analysis is correct.

Defendants' expert, Kleidon, testified at his deposition that a 5% statistical significance level (equating to a 95% confidence level) is "the standard test in the finance literature."  (Kleidon Dep. 39-40.)

More to the point, use of a two-tailed test is generally appropriate when evaluating market efficiency because not just positive, but also negative, correlation of returns may render a security's market inefficient.  Defendants have offered

---

[3]     Negative serial correlation exists when a market is shown through statistical evidence to consistently over-respond to news, such that positive returns on day 1 are predictive of negative returns on day 2 or, conversely, negative returns on day 1 are predictive of positive returns on day 2.

no authority to the contrary, and their expert argues in this regard only that in his opinion it is appropriate to test only for positive, not negative, serial correlation in this case, as that would be consistent with a hypothesis of delayed response to news, presumably due to his incorrect assumption that the results of the CASPER trial were publicly available by August 13. The presence of either positive serial autocorrelation (+ + or - - pattern) or negative serial autocorrelation (+ - or - + pattern) may indicate the possibility of weak form market inefficiency. Therefore, both possibilities must be tested. Accordingly, Marek's autocorrelation analysis correctly rejected that Flamel's ADRs were weak form inefficient during the Class Period.

In addition, pursuant to the fifth <u>Cammer</u> factor, Plaintiff's expert conducted an event study to verify market efficiency for Flamel's ADRs. Generally, event studies in cases such as these look at the expected return on a security; the unexpected return on the security due to an event, <u>i.e.</u>, the difference between the observed return or actual stock price and the expected return; and the statistical likelihood of an unexpected return as large as the one observed. Marek's study empirically demonstrated "a cause and effect relationship

33

between unexpected corporate events and financial releases and an immediate response in the stock price," Cammer, 711 F. Supp. at 1287, by showing that when important, unexpected news about Flamel was released to the market, the price of its ADRs moved in a directionally appropriate way by a statistically meaningful amount. (Marek Decl. 24-291 Marek Reply Decl. 15-22.) Conversely, Flamel's stock price did not change by a statistically meaningful amount that would be expected on an overall basis on non-event dates during the Class Period. Marek's event study shows statistically that, in the absence of new information regarding Flamel and its prospects, Flamel ADRs did not exhibit large price changes, also known as high volatility, beyond what one would expect by statistical probability alone. Specifically, Marek's study found that the absolute residual price return (that is, the difference between the observed return or actual stock price and the expected return) on non-event days was 2.15% while the absolute residual price return on event days was 6.77%. (Marek Reply Decl. 16.) Marek concluded that "[t]he high discrepancy in volatility between non-event dates and event dates is indicative of an efficiently-traded security, that is, one which exhibited a cause and effect relationship between unexpected corporate events and a rapid response in price." (Id.)

34

Defendants' expert has attacked Marek's methodology. (Kleidon Decl. 26-36.)   However, the event study methodology utilized by Plaintiff's expert is based on accepted scientific, peer-reviewed protocols and conforms to those requirements as set forth in his reply affidavit.   (See Marek Reply Decl. 15-22.)

Defendants' expert has further attacked the criteria which Marek used in determining whether or not a particular day in the Class Period was a "news" day.   (Kleidon Decl. 37-42.) However, this aspect of an event study necessarily requires a researcher to make an independent determination.   Moreover, Marek tested each of Kleidon's assertions that he (Marek) failed to include the proper "news" and "non-news" days in the event study.   Even accepting the assumptions that Marek categorized some "non-news" days as "news" days, which Marek asserts is not the case, Marek found that there is still a less than 1% chance that the price volatility in Flamel's ADRs occurred by chance during the Class Period.   (Marek Reply Decl. 21.)   Similarly, revising Kleidon's suggested "news" days to "non-news" days postulation, Marek found that there was a less than a 3% chance that the price volatility in Flamel's ADRs occurred by chance

during the Class Period. (Id. 21-22.) Thus, Kleidon's arguments regarding Marek's event study are unavailing and do not warrant the rejection of Marek's conclusion that Flamel's ADRs exhibited a cause and effect relationship between unexpected corporate events and a rapid response in price.

In considering the totality of factors, Plaintiff has established by the preponderance of the evidence that Flamel's ADRs traded in an efficient market during the Class Period and accordingly that the class is entitled to the presumption of reliance afforded by the fraud-on-the-market theory. See Fogarazzo, 263 F.R.D. at 102 n.83.

### ii. Loss Causation Can Be Demonstrated Through Class-Wide Proof

Defendants have contended that Plaintiff has failed to prove that common issues predominate over individual issues with respect to loss causation, "i.e. a causal connection between the material misrepresentation and the loss." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341 (2005) (citations omitted). A number of cases in the Second Circuit, however, "represent the position that a plaintiff is entitled to a presumption of reliance at the certification stage that does not require the court to make a

conclusive finding as to loss causation in order to trigger the
fraud-on-the-market presumption laid out in <u>Basic Inc. v.
Levinson</u>." <u>In re Flag Telecom Holdings</u>, 574 F.3d at 39.


Specifically, Defendants have relied on the Fifth
Circuit's decision in <u>Oscar Private Equity Inv. v. Allegiance
Telecom, Inc.</u>, 487 F.3d 261 (5th Cir. 2007), which reads <u>Basic</u>
to require a plaintiff to prove loss causation in order to avail
himself of the presumption of market efficiency.  However,

> Several courts in this District have expressly
> addressed the Fifth Circuit's decision in <u>Oscar</u>, and
> all have rejected the notion that a showing of loss
> causation is a requirement at the class certification
> stage . . . .  The Court agrees with the reasoning
> employed by the majority of courts in this District
> that have considered the issue, and finds that <u>Oscar</u>
> should be rejected as a misreading of <u>Basic</u>. Nothing
> in <u>Basic</u> or any Second Circuit precedent requires that
> Plaintiff prove loss causation by a preponderance of
> the evidence in order to invoke the <u>Basic</u> presumption
> and satisfy the requirements of Rule 23.

<u>Lapin</u>, 254 F.R.D. at 185-86 (citations omitted); <u>accord</u> <u>Wagner
v. Barrick Gold Corp.</u>, 251 F.R.D. 112, 118-19 (S.D.N.Y. 2008)
(concluding that in order to trigger the fraud-on-the-market
presumption and thereby satisfy the predominance requirement of
Rule 23(b)(3), plaintiffs need not prove loss causation at the
class certification stage); <u>Darquea</u>, 2008 WL 622811, at *4
(rejecting <u>Oscar</u> and holding that to show predominance,

"[p]laintiff [s] in the Second Circuit may benefit from the fraud-on-the-market presumption of reliance at the certification stage based solely on a showing that they made purchases or sales in an efficient market, and need not show that they specifically relied on the allegedly fraudulent conduct, as reliance-an element of a 10(b) claims-is presumed."); In re Omnicom Group, Inc. Sec. Litig., No. 02 Civ. 4483, 2007 WL 1280640, at *8 (S.D.N.Y. Apr. 30, 2007) (rejecting loss causation challenge to predominance as "an attempt to litigate class certification on the merits of the action"). This Court is in accord with that conclusion.

Plaintiff here has offered sufficient evidence to show that loss causation can be demonstrated by class-wide proof. See Lapin, 254 F.R.D. at 185 ("Plaintiff's showing that loss causation will be demonstrated by class-wide proof is sufficient to satisfy the predominance requirement of Rule 23(b)(3) as to loss causation . . . .Plaintiff has shown that, if the class plaintiffs are ultimately able to prove loss causation, that proof will be in the form of an event study provided by Plaintiff's expert"); Fogarazzo, 263 F.R.D. at 106-07 (Rule 23 requires proof that loss causation "may be proven class-wide, which may be shown by proposing a suitable methodology");

Initial Public Offering, 260 F.R.D. at 107 n.214 (plaintiffs
must "prove only that loss causation can be shown on a class-
wide basis"); Wagner, 251 F.R.D. at 119 ("Even if proof of loss
causation were a prerequisite at this stage, Plaintiffs have
satisfied the requirement. That is, [l]oss causation can be
established either where . . . the market reacted negatively to
a corrective disclosure or . . . the materialization of the
risks that were concealed by the alleged misrepresentations or
omissions proximately caused plaintiffs' loss." (citation and
internal quotation marks omitted)).

    Plaintiff argues that the severe reaction of the
market following the disclosure of the CASPER trial results on
August 23, 2007, as demonstrated by Marek's event study,
evidences loss causation. Marek testified at his deposition
that an event study designed to evaluate for loss causation
would require additional analysis. (Marek Dep. 130, 189.)
Marek's market efficiency event study and that Plaintiff is
prepared to submit a more thorough event study testing for loss
causation is sufficient at this stage of the litigation to show
that loss causation is susceptible to demonstration through
generalized proof. See Wagner, 251 F.R.D. at 119.

iii. Superiority


This case is best suited to proceed as a class action. The case involves dozens if not more potential claimants who are asserting claims based on predominantly common issues. Adjudicating individual claims would be a significant waste of judicial resources. In addition, this litigation has been ongoing since 2007. Class counsel and class representatives have already spent a significant amount of time litigating this case. This Court has also become familiar with the claims, further making it desirable to continue this litigation here. Finally, managing this litigation as a class action will not pose any substantial difficulties for the Court.


## V. Conclusion


Based on the facts and conclusions set forth above, Plaintiff's motion for class certification is granted, the class and Jenkins are certified, and the firms of Robbins Geller and Barroway Topaz are appointed as class counsel.

In light of the confidentiality stipulation and order entered in this case, the parties are directed to jointly submit a redacted version of this opinion to be filed publicly. The parties will additionally meet and confer on an appropriate discovery schedule.

It is so ordered.

New York, NY
March 6 , 2012

ROBERT W. SWEET
U.S.D.J.